## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| ENZON PHARMACEUTICALS, INC.,<br><br>Plaintiff,<br><br>v.<br><br>PHOENIX PHARMACOLOGICS, INC.,<br><br>Defendant. | Civil Action No.  04-1285-GMS |

## PLAINTIFF ENZON PHARMACEUTICALS'
## OPENING BRIEF IN SUPPORT OF MOTION TO STRIKE
## DEFENDANT'S AFFIRMATIVE DEFENSES

YOUNG CONAWAY STARGATT &
  TAYLOR, LLP
Josy W. Ingersoll (No.1088)
John W. Shaw (No. 3362)
Glenn C. Mandalas (No. 4432)
gmandalas@ycst.com
The Brandywine Building, 17th Floor
1000 West Street
Wilmington, Delaware 19801
(302) 571-6600

– and –

KENYON & KENYON
Richard L. DeLucia
Charles A. Weiss
Michael A. Siem
One Broadway
New York, NY  10004
(212) 425-7200

Attorneys for Plaintiff Enzon Pharmaceuticals, Inc.

Dated:  August 8, 2005

# TABLE OF CONTENTS

Page

NATURE AND STAGE OF PROCEEDINGS……………………………………………...1

SUMMARY OF ARGUMENT…………………………………………………………...2

STATEMENT OF FACTS………………………………………………………………...3

ARGUMENT……………………………………………………………………………...4

    I.    Phoenix's Affirmative Defenses Lack Factual Support And
        Should Be Stricken Under Rule 12(f)………………………………………….4

    II.    Phoenix's Affirmative Defenses Are Insufficient As A Matter
        Of Law And Should Be Stricken Under Rule 12(f)……………………………5

        1.    Phoenix's Affirmative Defense Of Laches Is Insufficient
            As A Matter Of Law……………………………………………….5

        2.    Phoenix's Affirmative Defense Of Equitable Estoppel Is
            Insufficient As A Matter Of Law………………………………….6

        3.    Phoenix's Affirmative Defense Of Waiver Is Insufficient
            As A Matter Of Law……………………………………………….6

        4.    Phoenix's Statute of Limitations Affirmative Defense
            Is Insufficient As A Matter Of Law……………………………….7

        5.    Phoenix's "Failure to State a Claim" Defense Is
            Insufficient As A Matter Of Law………………………………….7

CONCLUSION……………………………………………………………………………9

## NATURE AND STAGE OF PROCEEDINGS

On July 1, 2005 Enzon Pharmaceuticals, Inc. ("Enzon") filed an Amended Complaint against Phoenix Pharmacologics, Inc. ("Phoenix") alleging that Mike Clark is not properly named as the inventor of U.S. Patent No. 6,183,738 (the "'738 patent"). (D.I. 33 at ¶¶ 2-3). Clark is a former Enzon employee who, after leaving Enzon's employ, filed the applications that eventually lead to issuance of the '738 patent. Enzon alleges that the subject matter described and claimed in the '738 patent is based on work performed at Enzon during Clark's employment, either entirely or principally by Enzon scientists whose efforts were reported to Clark in his capacity as their direct or indirect supervisor. (D.I. 33 at ¶ 2).

Phoenix's First, Second and Third affirmative defenses to Enzon's allegations state that counts 1, 2 and 3, respectively, of Enzon's Amended Complaint are barred under the doctrines of laches and/or equitable estoppel. (D.I. 36 at p. 4). Phoenix further alleges that Enzon's claim of unjust enrichment, count 3, has been "waived" (also Third Affirmative Defense), is "barred by application of a statute of limitations" (Fourth Affirmative Defense) and "fails to state a claim upon which relief can be granted" (Fifth Affirmative Defense). (D.I. 36 at p. 4). Phoenix's Answer to the Amended Complaint states no facts in support of these defenses but instead simply states bare legal conclusions devoid of factual content. Enzon has requested that Phoenix seek leave to amend and provide the basis for these claims or to withdraw them, however Phoenix has refused this request. *See* July 25, 2005 letter from J. Lucci to M. Siem. (Attached as Exh. A).

Phoenix's affirmative defenses should be stricken because they are insufficiently pled (no facts recited, just legal conclusions) and insufficient as a matter of law. For these reasons, Phoenix's defenses should be stricken under Fed. R. Civ. P. 12(f).

## SUMMARY OF ARGUMENT

1.    The Affirmative Defenses in Phoenix's answer to Enzon's Amended Complaint are pled as bare legal conclusions and devoid of any factual averments.  They are insufficient under Fed. R. Civ. P. 8 and should be stricken as required by Fed. R. Civ. P. 12(f).

2.    The affirmative defenses identified by Phoenix in its answer would fail as a matter of law due to their legal insufficiency and unsupportability given the facts in this case.  Phoenix's legally insufficient defenses, therefore, should be stricken under Rule 12(f).

2

## STATEMENT OF FACTS

On July 1, 2005, Enzon filed an Amended Complaint against Phoenix alleging that Clark is not properly named as the inventor of the '738 patent.  (D.I. 33 at ¶¶ 2-3).  Enzon alleges that Mike Clark, a former Enzon employee, filed the applications that eventually lead to issuance of the '738 patent based upon information and work that he stole from Enzon.  (D.I. 33 at ¶ 2).

Phoenix filed an answer to Enzon's Amended Complaint which asserts several affirmative defenses, the entirety of which are as follows:

1. Count I is barred under the doctrines of laches and/or equitable estoppel.
2. Count II is barred under the doctrines of laches and/or equitable estoppel.
3. Count III is barred under the doctrines of waiver, laches and/or equitable estoppel.
4. Count III is barred by application of a statute of limitations.
5. Count III fails to state a claim upon which relief can be granted.

(D.I. 36 at p. 4).

Phoenix has pled its affirmative defenses as bare legal conclusions and has not set forth facts providing a sufficient basis for its defenses under Fed. R. Civ. P. 8(c).  Phoenix's defenses, therefore, should be stricken under Fed. R. Civ. P. 12(f).  Further, even if Phoenix were to provide the required factual support its defenses are legally unsupportable and still should be stricken under 12(f).

WP3:1133959.1                                                                                                      063541.1001

## ARGUMENT

### I.    Phoenix's Affirmative Defenses Lack Factual Support And Should Be Stricken Under Rule 12(f)

Phoenix's answer to Enzon's Amended Complaint merely asserts conclusions that

Enzon's allegations are barred.  The entirety of Phoenix's affirmative defenses are as follows:

1. Count I is barred under the doctrines of laches and/or equitable estoppel.
2. Count II is barred under the doctrines of laches and/or equitable estoppel.
3. Count III is barred under the doctrines of waiver, laches and/or equitable estoppel.
4. Count III is barred by application of a statute of limitations.
5. Count III fails to state a claim upon which relief can be granted.

(D.I. 36 at p. 4).

A mere reference to a doctrine or statutory provision is insufficient notice.  *Shechter v.*

*Comptroller of the City of New York*, 79 F.3d 265, 270 (2d Cir. 1996) (affirmative defenses

which amount to nothing more than mere conclusions of law and are not warranted by any

asserted facts have no efficacy) (internal quotations omitted); *see also Advanced Cardiovascular*

*Sys., Inc. v. Medtronic, Inc.*, No. C-95-3577 DLJ, 36 Fed. R. Serv. 3d (Callaghan) 648, at *29

(N.D. Cal. Jul. 24, 1996) ("To plead equitable estoppel, a party must allege [the] three essential

elements…."); *Gould v. Great-West Life & Annuity Ins. Co.*, 959 F. Supp. 214, 222 (D.N.J.

1997) (striking equitable estoppel claim for insufficiency of factual averments).

Affirmative defenses are governed by the same pleading standard as complaints.  Rule

8(b) provides, "[a] party shall state in short and plain terms the party's defenses to each claim

asserted . . . ."  Fed. R. Civ. P. 8(b).  Like complaints, affirmative defenses must give plaintiff

"fair notice" of the defense being advanced.  *Blonder-Tongue Labs., Inc. v. Univ. of Ill. Found.*,

402 U.S. 313, 350 (1971).  Rule 12(f) provides that "the court may order stricken from any

pleading any insufficient defense or any redundant, immaterial, impertinent, or scandalous

matter."  Fed. R. Civ. P. 12(f).  A defense may be struck if it fails to provide "fair notice" of the

4

basis of the defense. *Advanced Cardiovascular Sys., Inc.  v.  Scimed Sys., Inc.,* 40 U.S.P.Q.2d 1291, 1293 (N.D. Cal. 1996).

As shown Phoenix's affirmative defenses are mere conclusions of law and do not provide any facts to support the allegations contained therein.  Therefore, Phoenix's affirmative defenses fail to meet the requirements of Fed. R. Civ. P. 8(c) and the Court should strike Phoenix's affirmative defenses under Fed. R. Civ. P. 12(f).

## II.    <u>Phoenix's Affirmative Defenses Are Insufficient As A Matter Of Law And<br>Should Be Stricken Under Rule 12(f)</u>

A motion to strike a pleading serves to test the adequacy of the affirmative defenses*.  See Surface Shields, Inc. v. Poly-Tak Prot. Sys., Inc*., 213 F.R.D. 307, 308 (N.D. Ill. 2003*); see also Donovan v. Robbins*, 99 F.R.D. 593, 597 (N.D. Ill. 1983); *FDIC v. White*, 82 F. Supp. 304, 307 (D.N.J. 1993).  As shown below, Phoenix's affirmative defenses are insufficient as a matter of law and should be stricken.

### 1.    **Phoenix's Affirmative Defense Of Laches Is Insufficient As A Matter Of Law**

Phoenix alleges that Enzon's claims are barred by laches.  To support a claim under the doctrine of laches Phoenix must show that 1) there was an unreasonable and inexcusable delay in bringing the claim and 2) that the defendant was materially prejudiced as a result. *See Advanced Cardiovascular Sys., Inc. v. Scimed Life Sys., Inc.,* 988 F.2d 1157, 1161 (Fed. Cir. 1993); *see also A. C. Aukerman Co. v. R.. L. Chaides Constr. Co.,* 960 F.2d 1020, 1032 (Fed. Cir. 1992). For there to be a presumption of laches, Phoenix must show that at least six years had passed since Enzon knew or should have known of the '738 patent. *Meyers v. ASICS Corp.,* 974 F.2d 1304, 1307 (Fed. Cir. 1992).

Phoenix cannot argue that Enzon has committed laches and that it has been prejudiced by Enzon's actions.  Looking at the facts in the light most favorable to Phoenix, Enzon waited less

than four years from the time the '738 patent issued on February 6, 2001 to the filing of the

Complaint on September 21, 2004. This is far less than the six years required to create the

**presumption** of laches. Furthermore, correction of inventorship is a remedy that is available at

any time. *Advanced Cardiovascular Sys., Inc. v. Scimed Life Sys., Inc.,* 988 F.2d 1157, 1162

(Fed. Cir. 1993). Therefore, even if Phoenix was granted leave to amend its answer to provide a

basis for these defenses, the laches defenses would still fail because of their legal insufficiency.

### 2. Phoenix's Affirmative Defense Of Equitable Estoppel Is Insufficient As A Matter Of Law

To support a claim under equitable estoppel, Phoenix must show that (1) the actor had

knowledge of the truth but presented the facts in a misleading way through either "words,

conduct or silence," (2) the other person relied on those facts, and that (3) this person would be

materially harmed if the actor is permitted to "assert any claim inconsistent with his earlier

conduct." *A.C. Aukerman Co.,* at 1041. It is undisputable that Enzon could not have known of

the '738 patent until it issued in February 2001. Under no legal theory can Phoenix argue that

Enzon's actions support a claim under an equitable estoppel theory, in light of the fact that

Enzon brought suit in September 2004.

### 3. Phoenix's Affirmative Defense Of Waiver Is Insufficient As A Matter Of Law

Waiver is "the intentional relinquishment or abandonment of a known right." *Kontrick
v. Ryan*, 540 U.S. 443, 458 (2004)(internal quotations and citations omitted). Again, it is unclear

how any of these facts could support waiver. The '738 patent issued less than four years before

Enzon brought suit. Looking at the facts in a light most favorable to Phoenix, Enzon waited less

than four years prior to bringing suit. Under no legal theory could this support waiver.

6

**4. Phoenix's Statute of Limitations Affirmative Defense Is Insufficient As A Matter Of Law**

Phoenix alleges that Enzon's claims are barred under the appropriate statute of limitations. Under New Jersey law, the statute of limitations for a claim of unjust enrichment runs six years from the date the cause of action accrues. *Iwanowa v. Ford Motor Co.,* 67 F. Supp. 2d 424, 473 (D.N.J. 1999)(citing N.J. Stat. Ann. § 2A:14-1).[1] Even if Phoenix is correct in its assertions that a statute of limitations is applicable, as Phoenix's acts are ongoing, the statute of limitation would only act to limit Enzon's recovery, not bar Enzon from pursuing its claims. *See id.* (statute of limitations period runs from the time the cause of action accrues); *see also* p. 8, *infra* (setting forth the essential elements of an unjust enrichment claim).

**5. Phoenix's "Failure to State a Claim" Defense Is Insufficient As A Matter Of Law**

Phoenix's Fifth affirmative defense alleges that Enzon's claim for unjust enrichment "fails to state a claim upon which relief can be granted." To support a claim of unjust enrichment Enzon must allege (1) receipt of a benefit by Phoenix; (2) resulting detriment to Enzon; and, (3) circumstances making retention of the benefit unjust. *Caterpillar, Inc. v. Molins Plc.*, Civil Action No. 94-612-JJF, 1998 U.S. Dist. LEXIS 23068, at *38 (D. Del. Jul. 1, 1998). Paragraph 27 of Enzon's Amended Complaint alleges that Pheonix has received benefits in the form of, *inter alia*, its applying for and obtaining the '738 patent as well as other U.S. and foreign patents relating to the subject matter described and claimed in the '738 patent, and by engaging in clinical research and making regulatory filings relating to the subject matter described and claimed in the '738 patent, that these benefits have accrued to Phoenix at Enzon's

7

expense, and that this enrichment of Phoenix is unjust under the circumstances present in this case. (D.I. 33 at ¶ 27).

---

[1]     Enzon is not asking the Court to determine the applicable statute of limitation or whether it applies at this juncture. However, even if one is applicable, it would not bar Enzon's claims, it would merely limit Enzon's potential recovery.

WP3:1133959.1                                                            063541.1001

## CONCLUSION

For the foregoing reasons, Enzon respectfully requests that the Court grant its motion to strike Phoenix's Affirmative Defenses.

**YOUNG CONAWAY STARGATT**
**& TAYLOR, LLP**

By: _____

Josy W. Ingersoll (No.1088)
John W. Shaw (No. 3362)
Glenn C. Mandalas (No. 4432)
gmandalas@ycst.com
The Brandywine Building, 17th Floor
1000 West St.,
P.O. Box 391
Wilmington, DE  19801-0391
(302) 571-6600

- and -

KENYON & KENYON
Richard L. DeLucia
Charles A. Weiss
Michael A. Siem
KENYON & KENYON
One Broadway
New York, NY  10004
(212) 425-7200

Attorneys for Plaintiff
Enzon Pharmaceuticals, Inc.

August 8, 2005

9

# EXHIBIT A

**WOODCOCK WASHBURN**

INTELLECTUAL PROPERTY LAW

**PHILADELPHIA**
One Liberty Place, 46th Floor
Philadelphia, PA 19103
215-568-3100
Fax: 215-568-3439

**SEATTLE**
999 Third Avenue, Suite 1606
Seattle, WA 98104
206-332-1380
Fax: 206-624-7317

**JOSEPH LUCCI**
PHILADELPHIA OFFICE
215-564-8370
lucci@woodcock.com

July 25, 2005

*Via Telecopier & First Class Mail*

Mr. Michael A. Siem
Kenyon & Kenyon
One Broadway
New York, New York 10004

Re:    **Enzon Pharmaceuticals, Inc. v. Phoenix Pharmacologics, Inc.**
       **C.A. 04-1285 - U.S. District Court for the District of Delaware**

Dear Mike:

This responds to your letter of July 19, 2005, regarding Phoenix's Answer.

Phoenix believes that its defenses are appropriate and in accordance the requirement that a party state its defenses "in short and plain terms." Fed R. Civ. P. 8(a). Phoenix's defenses are particularly appropriate in view of the ambiguous nature of Enzon's claims.

Sincerely,

Joseph Lucci

WOODCOCK WASHBURN LLP
A Partnership Including Professional Corporations
www.woodcock.com

# EXHIBIT B

LEXSEE 1998 US DIST LEXIS 23068

**CATERPILLAR, INC., Plaintiff, v. MOLINS PLC, Defendant.**

**Civil Action No. 94-612-JJF**

**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF DELAWARE**

*1998 U.S. Dist. LEXIS 23068*

**July 1, 1998, Decided**

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Plaintiff patent licensee filed an action against defendant patent licenser in the United States District Court for the District of Delaware, asserting violations of Title IX of the Organized Crime Control Act of 1970, Racketeer Influenced and Corrupt Organizations (RICO) and common law fraud, deceit, and unjust enrichment after a district court determined that patents it purchased from the patent licenser were unenforceable.

**OVERVIEW:** After a court determined that patents issued to the patent licensee by the patent licenser were unenforceable, the patent licensee filed an action seeking damages in the amount it paid for the license plus the return it would have obtained on that money had the payment the license not been purchased. The court held (1) the patent licensee did not establish a Racketeer Influenced Corrupt Organizations violation based on the predicate acts of mail and wire fraud because it did not establish that the patent licenser had the specific intent to defraud, (2) the patent licensee did not establish fraud and deceit because it did not establish that it reasonably relied on information provided by the patent licenser and because it had inquiry notice of enforceability issues concerning the patent, (3) the patent licensee did not establish an unjust enrichment claim because it had inquiry notice of enforceability issues, and (4) the patent licensee was barred from recovering by the statute of limitations because the statute of limitations started to run when the patent licensee was put on inquiry notice of the fraud and the action was filed outside of the four-year limitations period.

**OUTCOME:** The court ruled in favor of the patent licenser holding that the patent licensee did not meet its burden of proof and that its claims were barred by the statute of limitations.

**CORE TERMS:** patent, inequitable conduct, license, reexamination, statute of limitations, deceit, inquiry notice, licensing, unjust enrichment, intent to defraud, summary judgment, wire fraud, predicate, mail, pattern of racketeering activity, preponderance, investigate, warnings, destruction, specific intent to defraud, reasonable diligence, requisite intent, enforceability, publicly, storm, failing to disclose, negotiations, examiner, reckless disregard, common law fraud

**LexisNexis(R) Headnotes**

*Criminal Law & Procedure > Criminal Offenses > Racketeering > Racketeer Influenced & Corrupt Organizations*
[HN1] There are five elements which are applicable to Racketeer Influenced and Corrupt Organizations (RICO) claims made under *18 U.S.C.S. § 1962:* (1) the requisite intent, (2) the elements of the predicate acts, mail and wire fraud, (3) a pattern of racketeering activity, (4) a RICO enterprise, and (5) causation. In order to establish a civil RICO violation, each of these elements must be proven by a preponderance of the evidence.

*Criminal Law & Procedure > Criminal Offenses > Fraud > Wire Fraud*
*Criminal Law & Procedure > Criminal Offenses > Fraud > Mail Fraud*
*Criminal Law & Procedure > Criminal Offenses > Racketeering > Racketeer Influenced & Corrupt Organizations*

[HN2] Civil Racketeer Influenced and Corrupt Organizations violations require no special mens rea beyond that associated with commission of a pattern of the individual predicate offenses. Where the predicate offenses are mail and wire fraud, the defendant must have knowledge of the unlawful objectives of the fraudulent scheme and willfully intend that those objectives be achieved.

*Criminal Law & Procedure > Criminal Offenses > Fraud > Wire Fraud*
*Criminal Law & Procedure > Criminal Offenses > Fraud > Mail Fraud*
[HN3] The elements of mail fraud are: (1) the existence of a scheme to defraud, (2) the participation by the defendant in the scheme with the specific intent to defraud, and (3) the use of the United States mail in furtherance of the scheme. *18 U.S.C.S. § 1341.* The elements of wire fraud are identical to those required to establish mail fraud, except that the third element requires the use of interstate wires in furtherance of the scheme to defraud.

*Criminal Law & Procedure > Criminal Offenses > Racketeering > Racketeer Influenced & Corrupt Organizations*
[HN4] In order to establish any cause of action under the Racketeer Influenced Corrupt Organizations statute, a plaintiff must prove that the defendant engaged in a pattern of racketeering activity. *18 U.S.C.S. § 1962.* The statute defines a pattern of racketeering activity as the commission of at least two acts of racketeering within a 10-year period. *18 U.S.C.S. § 1961(5).* An act of racketeering is further defined as a violation of certain enumerated criminal offenses, including mail and wire fraud. *18 U.S.C.S. § 1961(1).*

*Criminal Law & Procedure > Criminal Offenses > Racketeering > Racketeer Influenced & Corrupt Organizations*
[HN5] In addition to meeting statutory requirements, in order to prove a pattern of racketeering activity in an alleged Racketeer Influenced and Corrupt Organizations violation, a plaintiff must show that the racketeering predicates are related, and that they amount to or pose a threat of continued criminal activity. These requirements have been characterized as the "relatedness" and "continuity" requirements. Under the "relatedness" requirement, "predicate acts are related if they 'have the same or similar purposes, results, participants, victims, or methods of commission, or otherwise are interrelated by distinguishing characteristics and are not isolated events. The "continuity" requirement is satisfied if a plaintiff shows either that the series of racketeering acts were committed over a long period of time, or that they were committed over a short period of time with a serious threat of continued future acts.

*Criminal Law & Procedure > Criminal Offenses > Racketeering > Racketeer Influenced & Corrupt Organizations*
[HN6] Liability under civil Racketeer Influenced and Corrupt Organizations (RICO) violations also require the existence of an enterprise. An enterprise is statutorily defined as "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." *18 U.S.C.S. § 1961(4).* In considering the enterprise requirement of the RICO statute, three factors that, when present, indicate that an enterprise exists: (1) an ongoing organization, formal or informal, (2) continuity as a functioning unit, and (3) an existence separate and apart from the alleged pattern of racketeering activity. In addition to these requirements, the plaintiff must also prove that the defendant and the enterprise are distinct entities.

*Criminal Law & Procedure > Criminal Offenses > Racketeering > Racketeer Influenced & Corrupt Organizations*
[HN7] The Racketeer Influenced Corrupt Organizations (RICO) statute also imposes a causation requirement. In order to state a claim under RICO, a plaintiff must be injured in his business or property by reason of a RICO violation by the defendant. *18 U.S.C.S. § 1964.* The RICO pattern or acts proximately cause a plaintiff's injury if they are a substantial factor in the sequence of responsible causation, and if the injury is reasonably foreseeable or anticipated as a natural consequence.

*Criminal Law & Procedure > Criminal Offenses > Fraud*
*Criminal Law & Procedure > Scienter > Specific Intent*
[HN8] Generally, a specific intent to defraud is found where a defendant has knowledge of the illicit objectives of the fraudulent scheme and willfully intends that those illicit objectives be achieved. Statements made with a reasonable and good faith belief that they are true do not evidence a specific intent to deceive.

*Criminal Law & Procedure > Scienter > Recklessness*
[HN9] In considering the specific intent element of mail and wire fraud, reckless disregard for the truth can establish the requisite specific intent to defraud. Reckless disregard for the truth, however, is not a concept wholly unrelated to specific intent to defraud. Indeed, to act recklessly or with recklessness requires an individual to have knowledge of and/or appreciate the wrong, and then consciously and deliberately act in such a way so as to disregard the perceived wrong.

1998 U.S. Dist. LEXIS 23068, *

*Patent Law > Inequitable Conduct > Burdens of Proof*
*Patent Law > Inequitable Conduct > Effect, Materiality*
*& Scienter > General Overview*
[HN10] A district court's prior holding of inequitable conduct is not the equivalent of a finding of fraud.

*Patent Law > Inequitable Conduct > Effect, Materiality*
*& Scienter > General Overview*
*Patent Law > Infringement Actions > Exclusive Rights*
*> Manufacture, Sale & Use*
*Patent Law > Ownership > Conveyances > Licenses*
[HN11] Patents are presumed valid until proven otherwise. As such, a patent owner who exercises the right to exclude others from using the invention is presumed to be acting in good faith, even if the patent is later deemed invalid or unenforceable.

*Torts > Business & Employment Torts > Deceit &*
*Fraud*
[HN12] Under Massachusetts law, an action for fraud or deceit consists of five elements: (1) a false representation of a material fact; (2) made with the knowledge or belief of its falsity or made with reckless disregard of the actual facts; (3) for the purpose of inducing a party to act or refrain from acting thereon; (4) reliance upon the misrepresentation by that party; and (5) damage to the party as a result of such reliance. A plaintiff seeking to show that a defendant committed fraud or deceit must satisfy each of these elements by a preponderance of the evidence.

*Torts > Business & Employment Torts > Deceit &*
*Fraud*
[HN13] In all fraud cases, a plaintiff's reliance upon statements made by a defendant must be reasonable or justifiable. Where a plaintiff undertakes his or her own investigation into a matter, and uncovers facts which would cause a reasonable person to investigate further, the plaintiff must proceed with further investigation and is charged with the knowledge of all facts that such an investigation would have disclosed.

*Torts > Business & Employment Torts > Deceit &*
*Fraud*
[HN14] Unjust enrichment is an equitable cause of action premised on the principle that no person should be allowed unjustly to retain a benefit conferred by another at the other's expense. In order to establish a claim for unjust enrichment, a plaintiff must establish three elements: (1) receipt of a benefit, (2) resulting detriment to the other party, and (3) circumstances which make retaining the benefit unjust.

*Torts > Business & Employment Torts > Deceit &*
*Fraud*
[HN15] Under the "knew or should have known of its Racketeer Influenced Corrupt Organizations claim" test, the statute of limitations begins to run when a plaintiff is put on inquiry notice of fraud. Inquiry notice is triggered by evidence of the possibility of fraud, not full exposition of the scam itself. The plaintiff need only possess a low level of awareness; he need not fully learn of the alleged wrongdoing. Knowledge of all facts is not required to set off the prescriptive clock. Thus, the clock begins to tick when a plaintiff senses "storm warnings," not when he hears thunder and sees lightning.

*Torts > Business & Employment Torts > Deceit &*
*Fraud*
[HN16] Once a plaintiff is on inquiry notice of fraud, the plaintiff must exercise reasonable diligence to investigate and uncover the allegedly fraudulent activity. The allegation that a defendant has fraudulently concealed his or her conduct does not excuse a plaintiff from exercising reasonable diligence to uncover the fraud.

*Business & Corporate Entities > Agency > Duties &*
*Liabilities > Knowledge & Notice*
[HN17] The relationship between an attorney and the client he or she represents in a matter is one of agent and principal. Under general agency law, when an agent is employed to represent a principal with respect to a given matter and acquires knowledge material to that representation, for purposes of assessing the principal's rights and liabilities vis-a-vis a third person the agent's knowledge is imputed to the principal.

*Torts > Procedure > Statutes of Limitations*
[HN18] When the statute of limitations bars a legal remedy, it may also bar an equitable remedy in an analogous case or in reference to the same subject matter. Generally, an analogous statute of limitations is given great weight in deciding whether a plaintiff's equitable claim is time-barred.

*Torts > Procedure > Commencement*
[HN19] Tolling of the statute of limitations based on fraudulent concealment continues until the facts underlying plaintiff's cause of action are discovered or could have been discovered by the exercise of reasonable diligence. Stated another way, tolling continues until such time that a person or ordinary intelligence and prudence would have facts sufficient to put them on inquiry which, if pursued, would lead to the discovery of the injury.

**COUNSEL:** [*1] For Plaintiff: Robert W. Whetzel, Esquire, Frederick L. Cottrell, III, Esquire, Jeffrey L.

Moyer, Esquire, RICHARDS, LAYTON & FINGER, Wilmington, Delaware.

For Plaintiff: Willem G. Schuurman, Esquire, Mark A. Thurmon, Esquire, William B. Heming, Esquire, G. Scott Thomas, Esquire, Of Counsel, ARNOLD, WHITE & DURKEE, Austin, Texas.

For Defendant: Rudolf E. Hutz, Esquire, Arthur G. Connolly, Jr., Esquire, Patricia S. Rogowski, Esquire, F.L. Peter Stone, Esquire, CONNOLLY, BOVE, LODGE & HUTZ, Wilmington, Delaware.

**JUDGES:** Joseph J. Farnan Jr., Chief Judge.

**OPINIONBY:** Joseph J. Farnan Jr.

**OPINION:** July 1, 1998

Wilmington, Delaware

**Farnan, Chief Judge.**

This action was brought by Caterpillar, Inc. ("Caterpillar"), a Delaware corporation, against Molins PLC ("Molins"), a United Kingdom limited liability corporation, asserting violations of Title IX of the Organized Crime Control Act of 1970, "Racketeer Influenced and Corrupt Organizations," ("RICO") and common law fraud in the inducement, and deceit and unjust enrichment. These claims arise in connection with the prosecution and licensing of U.S. Patents Nos. *4,369,563* (the '563 patent) and *4,612,410* [*2] (the '410 patent) by Molinsand John Coventry Smith, Jr. n1

> n1 Although Smith is now retired, at the times relevant to the instant litigation, Smith was a lawyer engaged in private practice, specializing in patent law. Caterpillar did not name Smith as a defendant in the instant litigation.

In defense to this action, Molins contends that Caterpillar has not established the elements of the above-described claims. Molins also raises the affirmative defense of the statute of limitations as a bar to each of the claims Caterpillar asserts against it.

The Court has subject matter jurisdiction over this matter pursuant to *28 U.S.C. § § 1331* (Federal Question Jurisdiction), 1332 (Diversity Jurisdiction) and 1367(a)(Supplemental Jurisdiction). Additionally, the Court has personal jurisdiction over the parties under the Delaware Long-Arm Statute, *10 Del. C. § 3104*. Neither jurisdiction nor venue is contested by the parties.

The Court conducted a six-day bench trial in this matter, and this Opinion [*3] constitutes the Court'sFindings of Fact and Conclusions of Law on the claims and defenses presented.

**BACKGROUND**

As previously mentioned, the instant action arises in connection with the prosecution and licensing of the '563 patent and the '410 patent by Molins and John Coventry Smith, Jr. The Court is familiar with the facts and circumstances pertaining to the prosecution and subsequent litigation of the '563 and '410 patents, as this Court adjudicated the validity and enforceability of those patents in *Molins PLC v. Textron Inc., 821 F. Supp. 1551 (D. Del. 1992)* ("Textron I"). n2 In addition to relying upon the factual findings established by this Court in Textron I, Caterpillar also relies on evidence pertaining to Molins' licensing activities. Although Molins' licensing efforts occurred prior to the conclusion of the Textron litigation, the Textron litigation focused on Molins' conduct before the United States Patent and Trademark Office ("PTO") and not on its conduct with potential licensees. Therefore, the Court will discuss the bases for Caterpillar's claims, the Textron litigation and Molins licensing efforts, separately.

> n2 Because the Textron litigation is relevant to the instant action, the Court will summarize the pertinent aspects of that case. However, for a comprehensive presentation of the factual background of that litigation see *Textron, 821 F. Supp. at 1556-63* and *Molins v. Textron, 48 F.3d 1172, 1175-77 (Fed. Cir. 1995).*

[*4]

**I. The Textron Litigation**

A. Procedural Background

The Textron litigation commenced in 1986, when Molins and John Coventry Smith Jr. filed a complaint against Textron Corporation for infringement of U.S. Patent No. *4,369,563*, as modified by Reexamination Certificate B1 *4,369,563*. In response to the Complaint, Textron, through its attorneys Arnold, White & Durkee, filed an Answer and Counterclaim asserting invalidity, non-infringement and unenforceability of the '563 patent. Specifically, Textron contended that:

> Plaintiffs deceived the patent examiner by fraudulently failing to disclose relevant prior art. Specifically, Plaintiffs failed to

disclose the existence of certain patents and publications directed to the relevant prior art. Plaintiffs knew of this prior art because this art had been brought to the Plaintiffs' attention during their prosecution of related patent applications in Sweden, Germany, and Holland.

On February 1, 1989, Textron, Kearney & Trecker and AVCO (first defendants) filed a motion for summary judgment on the grounds of inequitable conduct based on the failure of Plaintiffs to disclose allegedly material prior art, the Wagenseil reference [*5] n3, to the PTO. The other defendants in the litigation filed corresponding summary judgment motions. Eventually, all the defendants filed a joint motion for summary judgment seeking a judgment of unenforceability due to the Plaintiffs' inequitable conduct in prosecuting the patent applications before the PTO. The Court denied all of the summary judgment motions, but granted a motion to try the inequitable conduct issues first.

n3 The "Wagenseil reference" refers to the article "America's First Tape-Controlled Production Line," by W. Wagenseil, which was published in the June 13, 1958 edition of Metalworking Production magazine and to other articles by the same author published between 1958 and 1962 relating to the same subject matter.

A nonjury trial was held on the inequitable conduct issues in 1991. The Court issued two Memorandum Opinions in the Textron litigation, one on the issue of inequitable conduct and one on the issue of attorneys fees. See *Textron I, 821 F. Supp. at 1551* (inequitable [*6] conduct opinion); *Molins PLC v. Textron, Inc., 840 F. Supp. 306 (1993)* (attorneys fees opinion) ("Textron II").

B. The Court's Opinions in Textron I and II

In Textron I, the Court concluded that the *'563* and *'410* patents were unenforceable due to the inequitable conduct of three agents of Molins: *Dennis Whitson, John Coventry Smith Jr., and Ivan Hirsh. 821 F. Supp. at 1581.* Whitson was a seasoned patent practitioner and head of Molins' patent department from 1974 to 1981. Smith was a member of the law firm which served as primary counsel to Molins for the prosecution of United States patent applications and owner of a one-half interest in the *'563* and *'410* patents. Hirsh succeeded Whitson as manager of Molins' patent department and assumed responsibility for the *'563* and *'410* patents and the litigation regarding them.

In examining the evidence concerning the conduct of Whitson before the United States Patent and Trademark Office ("PTO"), the Court found that Whitson intentionally failed to disclose the Wagenseil reference, a material prior art reference which was known to Whitson, during the prosecution of the patents in suit. *Id. 821 F. Supp. at 1569.* [*7] With regard to the conduct of Smith, the Court found that Smith did not have actual knowledge of nor did he cultivate ignorance of the Wagenseil reference, and therefore Smith was not under a duty to disclose Wagenseil to the PTO during the Williamson prosecution. *Id. at 1571.* However, the Court found that Smith did have knowledge of Wagenseil during the Reexamination of the *'563* patent and that Smith intentionally deceived the PTO by initially withholding the reference and later failing to highlight the reference by disclosing it to the PTO with 80 or 90 other prior art references. *Id. at 1572-73.* In addition, the Court found that Smith intended to deceive the PTO by failing to disclose three other material references, the Lemelson application 107,357 and Lemelson patents '014 and Reissue 26,770. *Id. at 1578.*

With respect to Hirsh's conduct, the Court also found that Hirsh intentionally withheld Wagenseil from the PTO by "burying" it with a large number of other prior art references during the Reexamination proceedings. The Court further found that Hirsh's destruction of documents after commencement of the Textron litigation [*8] evidenced Hirsh's intent to mislead and deceive the PTO.

Based on Hirsh's destruction of documents and Smith's failure to disclose material references to the PTO, the Court concluded that the case was an exceptional case and ordered additional briefing on the issue of attorneys fees. In Textron II, the Court concluded that the Textron Defendants were entitled to attorneys fees. *840 F. Supp. at 312-13 (D. Del. 1993).*

C. The Federal Circuit's Review Of Textron I and II

On appeal, the Federal Circuit affirmed in part, vacated in part and remanded the case. *Molins PLC v. Textron, Inc., 48 F.3d 1172 (Fed. Cir. 1995)* ("Textron III"). Specifically, the Federal Circuit affirmed the Court's conclusion that the *'563* and *'410* patents were unenforceable due to the inequitable conduct of Whitson. In this regard, the Federal Circuit affirmed the Court's finding that Whitson intended to deceive the patent office by failing to disclose material prior art, the Wagenseil reference. *48 F.3d at 1180-82.* However, the Federal Circuit overturned, as clearly erroneous, the Court's findings that Smith and Hirsh engaged in inequitable conduct in the [*9] prosecution of the patents by "burying" the Wagenseil reference in a large group of subsequently disclosed prior art and that Smith

engaged in inequitable conduct by failing to disclose the Lemelson patent. *48 F.3d at 1184* (characterizing Smith and Hirsh's disclosure of Wagenseil as "attempt[] to repair the situation" created by Whitson's initial withholding of Wagenseil and holding that "the determination that the method of disclosure constituted inequitable conduct cannot be sustained").

Regarding the Court's holding that the case was exceptional such that the Textron Defendants were entitled to attorneys fees, the Federal Circuit vacated the Court's award of attorneys fees and remanded the case for reconsideration of the exceptional determination. While the Federal Circuit concluded that "neither Molins nor Smith has convinced us of clear error in the court's findings regarding their litigation conduct," the Federal Circuit concluded that the Court should reconsider its exceptional determination in light of the Federal Circuit's decision to reverse the Court's findings that Hirsh and Smith engaged in inequitable conduct by failing todisclose the Lemelson application [*10] and patent and failing to highlight the Wagenseil reference. *48 F.3d at 1186-87.* Prior to the Court's reconsideration of the matter, Molins settled with the Textron Defendants.

## II. Licensing of the FMS Patents

A. Molins' Licensing Activities

Before the *'563* patent issued, Molins and Smith began implementing a plan to obtain licenses under the patent. After reviewing the foreign files corresponding to the *'563* patent, Hirsh discovered that Whitson had cited Wagenseil as the reason for abandoning Molins' patent applications in countries other than the United States. Thereafter, Molins and Smith retained a U.S. patent attorney, E.F. McKie ("McKie") for advice relating to the *'563* patent and supplied McKie with numerous documents for his review and consideration. In connection with this representation, Hirsh sent McKie two letters containing references to and copies of Molins' foreign patent application files. In addition, Hirsh sent Smith a letter discussing the *'563* patent and the Wagenseil reference.

Approximately six months prior to the start of the Textron litigation, Molins and Smith set their licensing plans inmotion. Armed with the favorable [*11] reexamination n4 of the *'563* patent, Molins and Smith sent letters on March 5, 1986, offering licenses under the FMS Patents to more than 200 companies, including Caterpillar. (DX 1004, Tr. 1204-07). The letters disclosed that the patents had gone through reexamination proceedings and that the outcome of the substantive portion of these proceedings was favorable to Molins. All of the companies receiving the March letters were initially offered identical license terms.

n4 Reexamination proceedings were instituted by Kearney & Trecker, a defendant in the Textron litigation, on October 3, 1984.

B. Caterpillar's Licensing Investigations and Negotiations With Molins

By March 10, 1986, Caterpillar began investigating the *'563* patent to determine whether it should accept Molins' license offer. (Tr. 24). Mr. William Thompson, General Patent Counsel for Caterpillar, undertook two tracks of activity, one track inside the company to examine whether Caterpillar infringed the patentsand one track outside the company [*12] to determine the validity of the patents. Internally, Mr. Thompson organized a group headed by Mr. Robert Muir, one of the senior patent attorneys at Caterpillar, to go through the files pertaining to the Molins' Patents and consider whether Caterpillar infringed the patents. (Tr. 27). Externally, Mr. Thompson contacted Ray Eifler, patent counsel for Kearney & Trecker, to obtain the reexamination materials. (Tr. 28). Through contacts with Mr. Eifler, Caterpillar became involved in meetings with Kearney & Trecker and General Motors to consider the patents.

Shortly thereafter, Caterpillar received a letter from the National Machine Tool Builders Association indicating that they were organizing a project to study the file history and prior art of the patents and extending offers for others to join the group (the "FMS Information Group") for a nominal sum. (Tr.33). Interested in obtaining as much information on the patent as possible from those more experienced in the field, Caterpillar joined the FMS Information Group. In June 1986, the FMS Information Group retained Willem Schuurman and his law firm, Arnold, White & Durkee, to assist in the investigationof the *'563* patent.

Through [*13] its contacts with Kearney & Trecker and the FMS Information Group, Caterpillar received two legal opinions in August 1986 concerning the validity of the patents, one from Mr. Ehrmann, an attorney with Quarles & Brady who represented Kearney & Trecker in the reexamination proceedings, and one from Mr. Schuurman. (Tr. 31-35, 47, 50, 152). Although both opinions raised a number of defenses to the validity of the patents, neither opinion raised the defense of inequitable conduct. However, both opinions indicated that the investigations were somewhat preliminary and that other defenses remained to be explored.

Through Mr. Thompson, Caterpillar reviewed these opinions and concluded that the defenses they raised were not very strong. In addition, as a result of its

internal investigations, Caterpillar determined that it may have a possible infringement issue. Faced with this dilemma, Caterpillar began to consider the licensing offer from Molins. However, Caterpillar quickly realized that the running royalty proposal in Molins' licensing offer was unworkable.

Then, in late August or early September 1986, Caterpillar learned that General Motors had entered into a lump-sum license agreement [*14] with Molins. Eager to learn more about General Motor's license, Mr. Thompson contacted Mr. Dean Ellis of General Motors. Although Mr. Ellis confirmed that GM had entered into a lump-sum license with Molins, Mr. Ellis disclosed little else about the deal other than it was in the "seven-digit" range. (Tr. 69).

On September 25, 1986, just three days after Molins commenced its lawsuit against Textron and AVCO, Mr. Thompson and Mr. Muir of Caterpillar met with Mr. Charles Pfund, Mr. Hirsh, Mr. Christopher Smith and Mr. John Smith of Molins in Boston. Although Mr. Thompson knew that Mr. Schuurman and Mr. Eifler, on behalf of the FMS Information Group, were meeting with Molins' representatives the next day, Mr. Thompson arranged the meeting to discuss the possibility of a license arrangement between Caterpillar and Molins. As a result of these preliminary discussions, Mr. Thompson concluded that Caterpillar should enter into a license agreement with Molins. (Tr. 89). Thereafter, Mr. Thompson began the task of accumulating information to assist him in negotiating the price of the license and seeking corporate authority to consummate a transaction.

The following day, at the September 26 meeting [*15] between Molins and the FMS Information Group, Mr. Schuurman announced the availability of the defense of inequitable conduct, contending that Molins had failed to disclose to the PTO prior art which was known to Molins for more than ten years. (DX-1264). Although Mr. Thompson knew of this meeting, he was not aware that Mr. Schuurman was going to discuss or present an inequitable conduct defense. (Tr. 175).

On October 21, 1986, eleven days after Textron, represented by Schuurman, filed its Answer and Counterclaim alleging fraud and inequitable conduct against Molins, Mr. Thompson and Mr. Muir met for a second time with Molins' representatives, Pfund, Hirsch, C. Smith and J. Smith in Boston. Armed with negotiating authority for the first time and sales information about installations, Caterpillar and Molins began to negotiate the terms of the license. At that meeting, the parties agreed to enter into a lump sum license for two million dollars, effective on November 1, 1986. Molins proposed one version of an End User Agreement memorializing the parties' arrangement; however, Caterpillar's attorneys

examined and redrafted the agreement. The final agreement signed by the parties required [*16] Caterpillar to pay $ 2 million on or about January 9, 1987, and included the following provision:

Licensor [Molins and Smith] shall be under no obligation to repay any amount previously paid.

(P 3.4).

C. Caterpillar's Post-Licensing Activities

Believing that Caterpillar had reached a "solution" with Molins, Mr. Thompson sent a letter dated December 3, 1986 to Mr. Eifler, copied to Mr. Schuurman, instructing him to remove Caterpillar from the FMS Information Group mailing list. (Tr. 96-97). Although Mr. Thompson was no longer formally involved with the FMS Information Group, he did have occasion to meet with Mr. Schuurman and Mr. Eifler at meetings for the American Intellectual Property Law Association ("AIPLA"). Though social events, Mr. Thompson became aware that inequitable conduct was an issue in the Textron litigation and that summary judgment motions had been filed in the litigation. (Tr. 108-109, 193-94). However, at that time, neither Mr. Thompson nor anyone else at Caterpillar were formally following the developments of the Textron litigation.

Then, in early September 1992, Caterpillar again began receiving letters directed to FMS Information Group members. [*17] (Tr. 200-01). Following the Court's November 1992 decision in the Textron litigation, Mr. Thompson received letters from both Mr. Schuurman and Mr. Eifler announcing the Textron decision and their availability to meet and answer any questions Caterpillar might have. In addition to these two letters directed to Mr. Thompson personally, Caterpillar also received a number of letters directed to FMS Information Group members regarding the Textron decision and the availability of Mr. Schuurman and Mr. Eifler to discuss the litigation.

Approximately two years after the Court's decision in Textron, Caterpillar filed the instant lawsuit against Molins alleging a RICO violation, fraud, deceit and unjust enrichment. Caterpillar seeks damages in the amount of $ 2,000,000, the lump sum payment it made for its license with Molins, plus the return Caterpillar would have obtained on that money had the payment to Molins and Smith not been made in January 1987.

**DISCUSSION**

**I. RICO Claims**

A. Applicable Law

1998 U.S. Dist. LEXIS 23068, *

Caterpillar raises six counts of civil RICO violations against Molins based on each of the four subsections of *18 U.S.C. § 1962.* Although [*18] each subsection contains different elements which must be proven to state a claim under that subsection, [HN1] there are five elements which are applicable to all of the RICO claims raised by Caterpillar: (1) the requisite intent, (2) the elements of the predicate acts, mail and wire fraud, (3) a pattern of racketeering activity, (4) a RICO enterprise, and (5) causation. In order to establish a civil RICO violation, each of these elements must be proven by a preponderance of the evidence. The Court will consider each of these elements in turn.

1. Intent Necessary To Establish A Civil RICO Violation

In examining the requisite intent or mens rea to establish a RICO violation, the Third Circuit has recognized that "the RICO statute itself is silent on the issue of mens rea and its legislative history offers no illumination of the congressional intent on this point." *Genty v. Resolution Trust Corp., 937 F.2d 899, 908 (3d Cir. 1991)* (citing Smith & Reed, Civil RICO P 5.04(4) at 5-31. Adopting the holdings of other courts examining the issue, the Court of Appeals for the Third Circuit has concluded that "[HN2] civil RICO requires no special mens rea beyond that associated with commission [*19] of a pattern of the individual predicate offenses." Id. (citing *United States v. Biasucci, 786 F.2d 504, 512* (2d Cir.), cert. denied, *479 U.S. 827, 93 L. Ed. 2d 54, 107 S. Ct. 104 (1986))*. Where, as here, the predicate offenses are mail and wire fraud, the defendant must have knowledge of the unlawful objectives of the fraudulent scheme and willfully intend that those objectives be achieved. Id. With this in mind, the Court will further consider the question of intent in the context of the elements required to establish mail and wire fraud.

2. The Elements Of The Predicate Acts--Mail And Wire Fraud

[HN3] The elements of mail fraud are: (1) the existence of a scheme to defraud, (2) the participation by the defendant in the scheme with the specific intent to defraud, and (3) the use of the United States mail in furtherance of the scheme. *18 U.S.C. § 1341; United States v. Hannigan, 27 F.3d 890, 892 (3d Cir. 1994); Jeffreys v. Exten, 784 F. Supp. 146, 155 (D. Del. 1992)*. The elements of wire fraud are identical to those required to establish mail fraud, except that the third element requires [*20] the use of interstate wires in furtherance of the scheme to defraud. *18 U.S.C. § 1343; United States v. Veksler, 62 F.3d 544, 551-52 (3d Cir. 1995)*, cert. denied sub nom. *McNaughton v. United States, 516 U.S. 1075, 133 L. Ed. 2d 731, 116 S. Ct. 780 (1996); Jeffreys, 784 F. Supp. at 155*.

3. A Pattern Of Racketeering Activity

[HN4] In order to establish any cause of action under the RICO statute, Caterpillar must prove that Molins engaged in a pattern of racketeering activity. *18 U.S.C. § 1962*. The statute defines a pattern of racketeering activity as the commission of at least two acts of racketeering within a ten year period. *18 U.S.C. § 1961(5)*. An act of racketeering is further defined as a violation of certain enumerated criminal offenses, including mail and wire fraud. *18 U.S.C. § 1961(1)*.

[HN5] In addition to these statutory requirements, the United States Supreme Court has held that in order to prove a pattern of racketeering activity, a plaintiff must show that "the racketeering predicates are related, and that they amount to or pose a [*21] threat of continued criminal activity." *H.J. Inc. v. Northwestern Bell Tel. Co., 492 U.S. 229, 239, 106 L. Ed. 2d 195, 109 S. Ct. 2893 (1989)*. Subsequent decisions have characterized these requirements as the "relatedness" and "continuity" requirements.

Under the "relatedness" requirement, "predicate acts are related if they 'have the same or similar purposes, results, participants, victims, or methods of commission, or otherwise are interrelated by distinguishing characteristics and are not isolated events.'" *Tabas v. Tabas, 47 F.3d 1280, 1292 (3d Cir.)*, cert. denied, *515 U.S. 1118, 132 L. Ed. 2d 275, 115 S. Ct. 2269 (1995)* (quoting *H.J. Inc., 492 U.S. at 240)*. The "continuity" requirement is satisfied if a plaintiff shows either that the series of racketeering acts were committed over a long period of time, or that they were committed over a short period of time with a serious threat of continued future acts. *H.J. Inc., 492 U.S. at 242*.

4. A RICO Enterprise

[HN6] Liability under civil RICO also requires the existence of an enterprise. An enterprise is statutorily defined as "any individual, partnership, [*22] corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." *18 U.S.C. § 1961(4)*. In considering the enterprise requirement of the RICO statute, the Supreme Court set forth three factors that, when present, indicate that an enterprise exists: (1) an ongoing organization, formal or informal, (2) continuity as a functioning unit, and (3) an existence separate and apart from the alleged pattern of racketeering activity. *United States v. Turkette, 452 U.S. 576, 583, 69 L. Ed. 2d 246, 101 S. Ct. 2524 (1981)*. In addition to these requirements, the plaintiff must also prove that the defendant and the enterprise are distinct entities. *Jaguar Cars, Inc. v. Royal Oaks Motor Car Co., 46 F.3d 258, 268 (3d Cir. 1995)*.

5. Causation

[HN7] The RICO statute also imposes a causation requirement. In order to state a claim under RICO, a plaintiff must be "injured in his business or property by reason of" a RICO violation by the defendant. *18 U.S.C. § 1964.* As the Third Circuit has explained, "'the RICO pattern or acts proximately cause a plaintiff's [*23] injury if they are a substantial factor in the sequence of responsible causation, and if the injury is reasonably foreseeable or anticipated as a natural consequence." *Brittingham v. Mobil Corp., 943 F.2d 297, 304 (3d Cir. 1991)* (citing *Hecht v. Commerce Clearing House, Inc., 897 F.2d 21, 23-24 (2d Cir. 1990)),* overruled on other grounds by, *Jaguar Cars, 46 F.3d 258 (3d Cir. 1995).*

B. Whether Caterpillar Has Established Its RICO Claims

In applying the RICO elements to the instant case, the Court concludes that Caterpillar has failed to establish by a preponderance of the evidence that Molins had the requisite intent to commit a RICO violation based on the predicate acts of mail and wire fraud. As discussed previously, mail and wire fraud require a showing that the defendant participated in the scheme to defraud with the specific intent to defraud. [HN8] Generally, a specific intent to defraud is found where a defendant has knowledge of the illicit objectives of the fraudulent scheme and willfully intends that those illicit objectives be achieved. See *Genty, 937 F.2d at 908.* Statements made with a reasonable and [*24] good faith belief that they are true do not evidence a specific intent to deceive. *United States v. Young, 470 U.S. 1, 32, 84 L. Ed. 2d 1, 105 S. Ct. 1038 (1985); United States v. Gross, 961 F.2d 1097, 1100, 1103* (3d Cir.), cert. denied, *506 U.S. 965, 121 L. Ed. 2d 358, 113 S. Ct. 439 (1992).*

[HN9] In considering the specific intent element of mail and wire fraud, the Third Circuit has also held that reckless disregard for the truth can establish the requisite specific intent to defraud. See *In re Phillips Petroleum, 881 F.2d 1236, 1249 (3d Cir. 1989).* Reckless disregard for the truth, however, is not a concept wholly unrelated to specific intent to defraud. Indeed, to act recklessly or with recklessness requires an individual to have knowledge of and/or appreciate the wrong, and then consciously and deliberately act in such a way so as to disregard the perceived wrong. See Black's Law Dictionary 1270-71 (6th ed. 1990) (defining recklessly as "*consciously* disregarding a substantial and unjustifiable risk" and defining recklessness as "*forseeing* [injurious] . . . consequences, [yet] persisting *in spite* [*25] *of such knowledge*") (emphasis added). Applying this definition to the instant case, Caterpillar would have to show, by a preponderance of the evidence, that Molins knew its patent was invalid, knew that in soliciting licensees it

would cause injury to Caterpillar, and yet proceeded to negotiate the license with Caterpillar.

In reviewing the record in this case, the Court concludes that Caterpillar has not shown, by a preponderance of the evidence, that Molins acted with a specific intent to defraud Caterpillar or with reckless disregard to the truth. Caterpillar relies on the circumstantial evidence concerning Whitson's conduct before the PTO and Hirsh and Smith's conduct before the PTO and this Court to establish that Molins had the requisite intent to defraud Caterpillar. For example, Caterpillar relies on: (1) this Court's finding in Textron that Whitson committed inequitable conduct by failing to disclose Wagenseil to the U.S. PTO, (2) Whitson's submission of a false declaration signed by Williamson during the *'563* prosecution, (3) Whitson's and Smith's failure to cite certain prior art references, the Lemelson and Kumagai patents, before the Examiner found and cited them, [*26] (4) Hirsh and Smith's failure to highlight the Wagenseil reference during the *'563* Reexamination, and (5) Hirsh's destruction of documents during the Textron litigation. However, in the Court's view, each of the instances upon which Caterpillar relies is insufficient to establish the requisite intent in this case.

First, this Court's finding in Textron that Whitson committed inequitable conduct does not translate into a finding of intent to defraud. Indeed, the level of Whitson's culpability found by the Court in Textron was less than what is necessary to establish fraud on the Patent Office. The Federal Circuit's affirmed finding in Textron III was not that Whitson engaged in "fraud" or a "scheme to defraud," but rather that Whitson engaged in inequitable conduct. Accordingly, [HN10] the Court's prior holding of inequitable conduct is not the equivalent of a finding of fraud. *Argus Chemical Corp. v. Fibre Glass-Evercoat Co., Inc., 812 F.2d 1381, 1383-85 (Fed Cir. 1987); FMC Corp. v. Manitowoc Co., 654 F. Supp. 915, 936* (N.D. Ill.) (distinguishing inequitable conduct from fraudulent procurement of patent), aff'd *835 F.2d 1411 (Fed. Cir. 1987).* [*27]

With respect to Whitson's submission of an allegedly false declaration, the Court found in Textron I, that "the filing of this declaration did not rise to the level of inequitable conduct." *821 F. Supp. at 1579.* If such action could not meet the threshold level of inequitable conduct, it is insufficient to satisfy the higher level of specific intent to defraud or reckless disregard for the truth that is required in this case. Accordingly, the Court finds this action to be insufficient evidence of intent to defraud.

Likewise, to the extent that Caterpillar relies on Whitson's and Smith's failure to cite certain prior art references, before the Examiner found and cited them,

the Court notes that the Federal Circuit held that it was not inequitable conduct to fail to cite a reference before the Examiner finds such references and cites them on his or her own. *Textron III, 48 F.3d at 1185.* If inequitable conduct cannot be found based on this conduct, the higher level of intent needed here cannot be found. Accordingly, the Court rejects the asserted conduct as evidence of Molins' intent to defraud.

With respect to Hirsh and Smith's failure to highlight [*28] Wagenseil duringthe *'563* Reexamination, the Court again observes that the Federal Circuit reversed this Court's finding of inequitable conduct and concluded that Molins, Hirsh and Smith had not engaged in inequitable conduct. To the contrary, the Federal Circuit viewed Hirsh and Smith's decision to cite Wagenseil, albeit in the midst of disclosure of a number of other references, as "an attempt to repair the situation" caused by Whitson's initial withholding of Wagenseil. *Id. at 1184.* Guided by the Federal Circuit's position on this issue, the Court cannot conclude that Hirsh and Smith's conduct during the *'563* Reexamination evidences an intent to defraud.

Lastly, with respect to Hirsh's destruction of certain documents during the Textron litigation, the Court finds this evidence, in the context of the case as a whole, to be insufficient to establish intent to defraud. In Textron, the Court found Hirsh's destruction of documents to constitute bad faith, "in light of the other evidence of inequitable conduct on the part of Molins." *Textron I, 821 F. Supp. at 1581.* However, as discussed above, the Federal Circuit overturned this Court's findings [*29] of inequitableconduct by Hirsh, thus eliminating the impact of the other evidence on the Court's conclusion concerning Hirsh's destruction of documents. Moreover, while Hirsh destroyed some documents, he also preserved many records which showed Whitson's awareness of Wagenseil and forwarded these documents to his attorney. (Tr. 1185-86). Hirsh's conduct in this regard neutralizes any suggestion of intent to defraud, for if Hirsh had intended to commit fraud, he certainly would not have preserved any records. Accordingly, the Court concludes that Hirsh's destruction of documents, in the context of the record as a whole, is insufficient to show an intent to defraud.

In addition to the Court's specific conclusions with respect to each of Caterpillar's examples of intent to defraud, the Court concludes that any of Caterpillar's circumstantial evidence of intent to defraud is equally balanced and neutralized by the direct evidence presented by Molins. Based on the direct evidence of Hirsh's testimony, which the Court credits, the Court concludes that at most, Molins was aware of a dispute regarding its patents, but Molins was plainly unaware that its patents were invalid and that licensing [*30]

them wouldcause injury to potential licensees such as Caterpillar. Hirsh and Smith did not believe that Whitson had committed inequitable conduct in the first instance, because they believed that Wagenseil was not material. Hirsh believed that Wagenseil was not material because, among other things, he believed its disclosure would be cumulative to the cited Kumagai patent and the diagram in Wagenseil was sketchy and indefinite. (Tr. 1067-69, 1086-1113).

Even though the Court held in Textron that Wagenseil was a material reference, finding that a reasonable patent examiner would have found Wagenseil important to patentability, the Court cannot impute its hindsight legal conclusions concerning Wagenseil to Hirsh. Rather, in considering the question of Hirsh's intent, the Court must examine the circumstances as they existed at the relevant time. In this case, the patent history shows that every Examiner in the PTO who considered the question of Wagenseil concluded that it was not a patent-defeating reference that required citation. Indeed, during the *'563* reexamination proceeding, Molins, Smith and C&T n5 cited Wagenseil, yet Wagenseil did not form the basis for a rejection of any [*31] of the claims. The PTO confirmed the patentability of the *'563* claims over Wagenseil. (Tr. 1194-95, CAT 537 at 642-52, 1578-90). Similarly, during the prosecution of the *'410* patent, Molins and Smith cited Wagenseil, yet Wagenseil never formed the basis for a rejection of any claims. The PTO found the *'410* claims, which are process counterparts of the *'563* patent, to be patentable over Wagenseil. (Tr. 1197, DX 1586 at 303-13, 330-52, 435-52). Given the PTO's approach to Wagenseil, the Court cannot say that Hirsh's belief that Wagenseil was immaterial and that Whitson had not committed inequitable conduct by failing to disclose Wagenseil was unreasonable.

n5 C&T refers to the parent company of Kearney and Trecker.

In addition, the Court notes that both Hirsh and Smith knew Whitson personally and did not believe that he would intentionally deceive the U.S. PTO. (Tr. 307, 340, 382, 498, 341, 449, 498, 515, 592, 1163-65). Even though this Court concluded in Textron that Whitson committed inequitable conduct, [*32] the Court cannotsay that Hirsh and Smith's beliefs concerning Whitson's intent were unreasonable, under the circumstances.

Although Hirsh and Molins may have been aware of a dispute concerning the *'563* patent, at the time Hirsh directed Molins' efforts to license and enforce the *'563* patent, Hirsh believed Molins would ultimately prevail.

Moreover, [HN11] patents are presumed valid until proven otherwise. As such, a patent owner who exercises the right to exclude others from using the invention is presumed to be acting in good faith, even if the patent is later deemed invalid or unenforceable. *Concrete Unlimited, Inc. v. Cementcraft Inc., 776 F.2d 1537, 1539 (Fed. Cir. 1985)* (reversing district court's findings that patent owner was "guilty of acts of unfair competition by taking business away from the Defendant by threats and infringement actions based on the fraudulently obtained patent" and concluding that patent holder "had right to exclude others from making using and selling the invention and to enforce those rights until the . . . patent was held invalid"); see also Dow Chemical Co. v. Exxon Corp., C.A. No. 94-572-SLR, slip op. at 6 (D. Del. Nov. 25, 1996). At [*33] the time Hirshand Molins negotiated the license with Caterpillar, no court had yet ruled on the validity of the *'563* patent, and therefore, the Court concludes that Molins and Smith were entitled to put the *'563* patent to the test, without having their intent in so doing characterized as fraudulent when the ultimate decision was adverse to them. Accordingly, the Court concludes that Hirsh and Molins did not act with the intent to defraud when it negotiated a license with Caterpillar.

In sum, the Court concludes that Caterpillar's circumstantial evidence of Molins' intent to defraud is insufficient to establish, by a preponderance of the evidence, the requisite intent for the predicate acts of mail and wire fraud. Because Caterpillar cannot establish the predicate acts, Caterpillar cannot establish the threshold requirement of racketeering activity that is essential for all of its RICO claims, and therefore, the Court need not examine whether Caterpillar has satisfied the remaining elements of its RICO claims. Accordingly, the Court concludes that Caterpillar has failed to establish its RICO claims.

## II. Common Law Fraud And Deceit Claims

### A. Applicable Law

[*34] [HN12] Under Massachusetts law, an action for fraud or deceit consists of five elements: (1) a false representation of a material fact; (2) made with the knowledge or belief of its falsity or made with reckless disregard of the actual facts; (3) for the purpose of inducing a party to act or refrain from acting thereon; (4) reliance upon the misrepresentation by that party; and (5) damage to the party as a result of such reliance. *Bond Leather Co. v. Q.T. Shoe Mfg. Co., 764 F.2d 928, 935 (1st Cir. 1985);* see also *Christian v. Mooney, 400 Mass. 753, 511 N.E.2d 587, 593 (Mass. 1987, cert. denied, 484 U.S. 1053, 98 L. Ed. 2d 970, 108 S. Ct. 1003 (1988).* A plaintiff seeking to show that a defendant committed fraud or deceit must satisfy each of these elements by a preponderance of the evidence. *Compagnie De Reassurance D'ile de France v. New England Reinsurance Corp., 57 F.3d 56, 72 (1st Cir.), cert. denied, 516 U.S. 1109 (1995).*

### B. Whether Caterpillar Has Established Its Fraud And Deceit Claims

Caterpillar's common law fraud and deceit claims are based on the events leading up to Caterpillar's license [*35] with Molins and Smith. In particular, Caterpillar bases its claimson three alleged misrepresentations by Molins: (1) Molins' representation that the *'563* patent was a strong patent, (2) Molins' failure to disclose information concerning the foreign counterpart application, and (3) Molins' representation that the foreign counterpart applications were abandoned for business reasons.

Assuming arguendo that Caterpillar could prove that Molins' alleged statements and/or omissions were misrepresentations made by Molins' with knowledge of or reckless disregard for their falsity for the purpose of inducing Caterpillar to take a license, Caterpillar still cannot prevail on its common law fraud and deceit claims, because Caterpillar cannot establish the requisite reliance. [HN13] In all fraud cases, a plaintiff's reliance upon the statements made by a defendant must be reasonable or justifiable. *Trifiro v. New York Life Ins. Co., 845 F.2d 30, 33 n.1 (1st cir. 1988); Town & Country Fine Jewelry Group, Inc. v. Hirsch, 875 F. Supp. 872, 876 (D. Mass. 1994).* Where a plaintiff undertakes his or her own investigation into a matter, and uncovers facts which would cause [*36] a reasonable person to investigate further, the plaintiff must proceedwith further investigation and is charged with the knowledge of all facts that such an investigation would have disclosed. *Jensen v. Snellings, 841 F.2d 600, 607 (5th Cir. 1988); Briskin v. Ernst & Ernst, 589 F.2d 1363, 1367 (9th Cir. 1978).*

As discussed in detail in Section IV. B. infra of this Opinion, Caterpillar undertook its own investigation into Molins' *'563* patent before it took a license. Caterpillar investigated the reexamination proceedings of the patents and joined the FMS Information Group to obtain information about the patent. During the course of its investigations, Caterpillar should have discovered, through the publicly available *'563* prosecution files, including Molins Rule 501 prior art citation, that a substantial amount of prior art had been cited in foreign prosecutions, but had not been cited during the original *'563* prosecution. Such information was sufficient to lead Mr. Schuurman to investigate the inequitable conduct issue, and likewise, should have been sufficient to put Caterpillar on inquiry notice regarding the inequitable conduct issue. (DX 1637, [*37] DX 1638; Tr. 1063-64,

1187-88, 1191-92). Once on inquiry notice, Caterpillar is charged with all the facts a further investigation would have revealed. *Jensen, 841 F.2d at 607; Briskin, 589 F.2d at 1367.* As is evident from the fact that Mr. Schuurman and his law firm compiled a volume on the inequitable conduct issue, had Caterpillar conducted a further investigation into the patent, it would have learned a substantial amount of information concerning the inequitable conduct issue. n6

> n6 For a discussion of Schuurman's knowledge concerning the inequitable conduct issue, see infra Section IV.B.3. of this Memorandum Opinion.

Moreover, throughout the course of its investigations into the *'563* patent, Caterpillar received two opinions from two separate law firms that the *'563* patent was invalid. Despite this advice, and the knowledge it should have obtained from its own investigations, Caterpillar decided to enter into a "no recourse" license with Molins. Given that Caterpillar [*38] engaged in its own investigations and solicited external opinions regarding the patent, and charging Caterpillar with the knowledge that a diligent investigation would have uncovered, the Court concludes that Caterpillar cannot demonstrate that it justifiably or reasonably relied on any alleged misrepresentations or omissions by Molins. Accordingly, the Court concludes that Caterpillar has failed to establish its common law fraud and deceit claims by a preponderance of the evidence.

## III. Unjust Enrichment Claim

### A. Applicable Law

[HN14] Unjust enrichment is an equitable cause of action premised on the principle that "no person should be allowed unjustly to retain a benefit conferred by another at the other's expense." *United States v. Bell, 818 F. Supp. 444, 449 (D. Mass. 1993).* In order to establish a claim for unjust enrichment, a plaintiff must establish three elements: (1) receipt of a benefit, (2) resulting detriment to the other party, and (3) circumstances which make retaining the benefit unjust. *In re Healthco International, Inc., 195 B.R. 971, 989 (D. Mass. 1996).*

### B. Whether Caterpillar Is Entitled to Recover Under An Unjust Enrichment [*39] Theory

In applying the elements of unjust enrichment to the instant case, the Court concludes that Caterpillar is not entitled to recovery under this theory. While it is true that Molins and Smith received a benefit in the sum of $ 2,000,000 for the Caterpillar license, the Court cannot conclude that Molins was unjustly enriched. Caterpillar knew or should have known that there were enforceability issues concerning the patent, yet Caterpillar bargained for a lump sum license with no recourse. In so doing, Caterpillar received value for its license. Caterpillar was able to continue to invest in FMS systems as part of its PWAF program, unhampered by patent litigation or threat of patent litigation with Molins. (Tr. 982-83). Indeed, once it took its licence with Molins, Caterpillar took considerably less interest in following the developments of the Textron case and was, therefore, able to direct its efforts toward its own programs and advancements. (Tr. 107-08, 179-80). Moreover, given Caterpillar's failure to establish its RICO, fraud or deceit claims, the Court concludes that the circumstances do not render Molins' retention of the $ 2,000,000 unjust.

## IV. Statute of Limitations [*40]  Defense

### A. Applicable Law

Prior to trial in this case, the Court heard oral argument on a Motion For Summary Judgment Based On The Statute Of Limitations (D.I. 171) filed by Molins. Among the disputes raised by this Motion was a choice of law issue. Specifically, the Court was asked to determine whether the accrual rule of the First Circuit or the Third Circuit should apply for purposes of determining whether Caterpillar's RICO claims were time barred. In resolving this issue, the Court concluded that the appropriate law to apply was the law of the Third Circuit.

Unlike other circuits, the Third Circuit adhered to a two-part accrual rule. *Keystone Ins. Co. v. Houghton, 863 F.2d 1125, 1130 (3d Cir. 1988).* Under the first part of the rule, which was similar to the rule used in the First Circuit, as well as other circuits, the limitations period begins to run when a plaintiff knew or should have known that the RICO claim, including a "pattern or racketeering activity," existed. However, unlike other circuits, the Third Circuit added the following exception to the rule:

> If, as part of the same pattern of racketeering activity, there is further injury [*41] to the plaintiff or further predicate acts occur, . . . the accrual period shall run from the time when the plaintiff knew or should have known of the last predicate act which is part of the same pattern of racketeering activity. The last predicate act need not have resulted in injury to the plaintiff but must be part of the same pattern."

Id.

Recently, in Klehr v. A.O. Smith Corporation, the United States Supreme Court unanimously ruled that the Third Circuit's rule "is not a proper interpretation of the law." *521 U.S. 179, 187, 117 S. Ct. 1984, 1989, 138 L. Ed. 2d 373 (1997).* Adopting the reasoning of several other circuits, the Supreme Court stated:

> The last predicate act rule creates a limitations period that is longer than Congress could have contemplated. . . . It thereby conflicts with a basic objective--repose--that underlies limitations periods. . . . Indeed, the rule would permit plaintiffs who know of the defendant's pattern of activity simply to wait, "sleeping on their rights," as the pattern continues and treble damages accumulate, perhaps bringing suit only long after the "memories of witnesses have faded or evidence is lost." We [*42] cannot find in civil RICO a compensatory objective that would warrant so significant an extension of thelimitations period, and civil RICO's further purpose--encouraging potential private plaintiffs diligently to investigate--suggests the contrary.

*Id. 521 U.S. at 187, 117 S. Ct. at 1989-90* (citations omitted). Based on this holding, the Court must omit the last predicate act rule from its analysis and focus on when Caterpillar knew or should have known that its alleged RICO claim existed.

The Third Circuit's application of the "knew or should have known of its RICO claim" test is consistent with the manner in which that test has been applied by other courts. [HN15] Under this test, the statute of limitations begins to run when a plaintiff is put on inquiry notice of fraud. "Inquiry notice is triggered by evidence of the possibility of fraud, not full exposition of the scam itself." *Kennedy v. Josephthal & Co., 814 F.2d 798, 802 (1st Cir. 1987).* In explaining this test, one court has stated:

> The plaintiff need only possess a low level of awareness; he need not fully learn of the alleged wrongdoing. Knowledge of all facts is not required [*43] to set off the prescriptive clock. Thus, the clock begins to tick when a plaintiff senses

"storm warnings," . . . not when he hears thunderand sees lightning.

*Jensen v. Snellings, 636 F. Supp. 1305, 1309 (E.D. La. 1986)* (citations omitted); see also *Kennedy, 814 F.2d at 801* (characterizing facts that trigger inquiry notice as "sufficient storm warnings" to alert reasonable person to possibility that there were either misleading statements or significant omissions involved in transaction).

[HN16] Once a plaintiff is on inquiry notice of fraud, the plaintiff must exercise reasonable diligence to investigate and uncover the allegedly fraudulent activity. The allegation that a defendant has fraudulently concealed his or her conduct does not excuse a plaintiff from exercising reasonable diligence to uncover the fraud. *Klehr, 117 S. Ct. at 1993* (recognizing circuit split on whether plaintiff must exercise reasonable diligence and concluding that in the "context of civil RICO . . . 'reasonable diligence' does matter, and a plaintiff who is not reasonably diligent may not assert 'fraudulent concealment'").

Accordingly, in determining [*44] when Caterpillar knew or should have known of the existence of its RICO claims based on Molins' alleged fraudulent conduct, the Court must answertwo questions: (1) when did Caterpillar know enough to excite further inquiry; and (2) once Caterpillar knew enough to excite inquiry, was the investigation Caterpillar undertook to uncover the fraud reasonable? *Hill v. Equitable Bank, 655 F. Supp. 631, 641 (D. Del 1987)* (citations omitted). The Court's resolution of these questions is fact intensive.

B. Whether Caterpillar's RICO Claims Are Barred By The Statute Of Limitations

The parties agree that the statute of limitations period for civil RICO claims is four years. Caterpillar commenced the instant lawsuit on November 21, 1994. Accordingly, the critical date for the Court's statute of limitations analysis is November 21, 1990. If Caterpillar knew or should have known that its RICO claims existed before November 21, 1990, as Molins contends Caterpillar did, then Caterpillar's claims would be time-barred. If, however, as Caterpillar contends, it did not learn of its RICO claims until the Court's November 24, 1992 Opinion in the Textron litigation, then Caterpillar's [*45] claims would be well within the four-year limitations period and would not be time-barred.

Based on the testimony adduced at trial and thedocuments admitted into evidence, the Court finds that Caterpillar received "sufficient storm warnings" to put it on inquiry notice of possible fraud by Molins well before November 21, 1990. However, despite having known enough to excite further inquiry, the Court further

finds that Caterpillar failed to exercise reasonable diligence to investigate and uncover Molins' allegedly fraudulent activity.

1. Caterpillar's Pre-License Investigation Into The Reexamination Proceedings Of The FMS Patents

Caterpillar's first warnings of the inequitable conduct issue should have come from its investigation into the reexamination proceedings before it took its license from Molins. After receiving Molins' licensing offer, Caterpillar contacted Raymond Eifler of Kearney & Trecker, the company who initiated the reexamination proceedings of the '563 patent. Caterpillar received reexamination documents from Mr. Eifler and from Mr. Ehrmann of Quarles & Brady, outside patent counsel to C&T. Based on Molins' publicly available Rule 501 submission, Mr. Eifler recognized [*46] an inequitable conduct issue because a substantial amount of prior art had been cited in foreign countries, but not cited during the original '563 prosecution. (DX 1223 at 83-85, 92-93). Likewise, Mr. Ehrmann of Quarles & Brady was concerned about the inequitable conduct issue and placed his concerns on the public record by submitting a formal Petition to the Commissioner contending that Molins had "buried" pertinent prior art during the reexamination by its extensive submission under Rule 501. (DX 1075 at 4, Tr. 621-25). As publicly available documents that were part of the reexamination which Caterpillar was investigating, Caterpillar could have and indeed, should have been aware that a substantial amount of prior art was not cited in the United States prosecution of the '563 patent and that Mr. Ehrmann had made a charge that Molins buried information. In fact, Mr. Muir testified that Mr. Booth had called to his attention the fact that Mr. Ehrmann had made an allegation that Molins' failed to disclose information to the PTO by burying references. (Tr. 936-37, 985). Although Caterpillar was aware of the burying charge, Caterpillar neither asked Molins about this charge, nor followed [*47] up on it in its own investigations.

2. Caterpillar's Relationship With The FMS Information Group

While Caterpillar's internal investigation of the original and reexamination proceedings of the patent were continuing, Caterpillar was also engaging in an external investigation of the patent by joining the FMS Information Group. Through its participation in the FMS Information Group, Caterpillar again received storm warnings that inequitable conduct by Molins was an issue. As the agenda for the FMS Information Group's first meeting indicates, the FMS Information Group was interested in the "duty of disclosure" or inequitable conduct by Molins from the outset. (DX 1124, Tr. 665). Although Caterpillar appeared on one of the lists of Expected Attendees for the first meeting, neither Mr. Muir nor Mr. Thompson recalled attending the meeting. (DX 1103). However, regardless of whether Caterpillar attended this initial meeting, it is not disputed that Caterpillar was one of the first members to join the FMS Information Group. As a "dues paying" member of the FMS Information Group, Caterpillar expected to receive all the information that the Group and the Group's counsel, Mr. Schuurman, had on [*48] the validity and enforceability of the FMS patents, and therefore, as a member of the FMS Information Group, Caterpillar should have known that the Group considered inequitable conduct to be an important matter. (Tr. 138).

Through its contacts with the FMS Information Group, Caterpillar also received an opinion rendered by Mr. Schuurman on the validity and enforceability of the '563 patent. In addition to raising several defenses to the validity and enforceability of the patent, the opinion specifically stated that it was preliminary in nature and that further investigations of the prior art and related matters were being pursued. (DX 1137P; Tr. 165-66, 1031-33, 1036-37). Despite this preliminary language, which should have alerted Caterpillar to the need for further investigations, Caterpillar hastened into license negotiations with Molins.

At trial, Mr. Thompson testified that he believed this was his "last best shot" at obtaining information about the patent before he had to begin licensing negotiations with Molins. (Tr. 165). Although Mr. Thompson's testimony suggests that Caterpillar may have felt pressure or urgency about taking a license, the record belies that such pressure [*49] or urgency actually existed. For example, the FMS Information Group, which included potential licensees like Caterpillar, expected a further report from Schuurman in November 1986. Moreover, Caterpillar knew that many of the FMS Information Group companies were declining to take licenses from Molins and were following Kearney & Trecker's lead in challenging the patents. (Tr. 59-60, 178-79). In addition, Schuurman himself thought he was working under a deadline that expired no earlier than December 1986. Indeed, Caterpillar's Mr. Thompson acknowledged that, although Molins had extended the time frame for negotiations with Caterpillar before, Caterpillar did not seek an extension of time from Molins to await the further investigations of the FMS Information Group or Schuurman. (DX 1016, 1025; Tr. 166). However, even though Caterpillar did not ask for an extension, Molins' Pfund wrote Thompson and other prospective licensee indicating that the deadline for accepting a license with Molins and Smith would be extended to March 31, 1987. (DX 1025). Caterpillar was at least on inquiry notice that further investigations of the patents, and in particular the prior art, needed to be

conducted, [*50] yet Caterpillar unreasonably chose to forgo further investigations--investigations which it paid for through its membership dues to the FMSInformation Group--and hurry into its license negotiations.

Caterpillar arranged to meet with Molins' representatives for the first time to discuss a license on September 25, 1986. Although Caterpillar knew that the FMS Information Group was planning to meet with Molins on September 26, Caterpillar turned its attention toward licensing negotiations without waiting to hear the results of the meeting from the group it had paid to join to obtain information. (Tr. 174).

3. Caterpillar's Relationship With Willem Schuurman

Whether as a member of the FMS Information Group or in its individual capacity, it is not disputed that Caterpillar had an attorney-client relationship with Schuurman and his law firm, Arnold, White & Durkee. What is disputed, however, is the duration of the relationship. Molins contends that Caterpillar & Schuurman's attorney-client relationship lasted at least until December 3, 1986, and perhaps, even later than that date. In response, Caterpillar has taken two different positions. In their Answer Brief In Opposition To Molins' [*51] Motion For Summary Judgment Based On The Statute Of Limitations, Caterpillar states that it was a client of Arnold, White & Durkee until December 3, 1986, whenCaterpillar sent a letter instructing Arnold, White & Durkee to take it off the mailing list for the FMS Information Group. (D.I. 193 at 43). Caterpillar further states that this "fact is not in dispute." However, at trial, Caterpillar's Thompson suggested that the relationship between Caterpillar & Arnold, White & Durkee ended in late October 1986, and not in December 1986. Based on the strength of the admissions made in Caterpillar's Answering Brief and on the record evidence that Caterpillar did not extract itself from the FMS Information Group mailing list until December 1986, the Court finds that an attorney client relationship existed between Caterpillar and Arnold, White & Durkee until December 3, 1986.

[HN17] The relationship between an attorney and the client he or she represents in a matter is one of agent and principal. Under general agency law, when an agent is employed to represent a principal with respect to a given matter and acquires knowledge material to that representation, for purposes of assessing the principal's [*52] rights and liabilities vis-a-vis a third person the agent's knowledge is imputed to the principal. *Veal v. Geraci, 23 F.3d 722, 725 (2d Cir. 1994).*Applying these principles to the instant case, the Court concludes that Caterpillar is constructively charged with the knowledge of Schuurman and Arnold, White and Durkee from June

1986, when Arnold, White & Durkee was hired to represent the FMS Information Group, through and until December 3, 1986, when Caterpillar ended its participation in the FMS Information Group. n7

> n7 Again, the Court notes Caterpillar's agreement with this conclusion, as set forth in their Answering Brief. (D.I. 193 at 43).

During this time frame, the Court finds that Schuurman and Arnold, White & Durkee had knowledge concerning Molins' alleged inequitable conduct that is attributable to Caterpillar. For example, at the September 26, 1986 meeting between the FMS Information Group and Molins, Schuurman expressly attacked the enforceability of the *'563* patent on the ground of [*53] inequitable conduct. (DX 1264; Tr. 1038-42, 1227-29). Specifically, Schuurman contended that Molins had failed to cite to the PTO references known to Molins for morethan ten years, namely patents and publications cited during the prosecution of the foreign counterparts to the *'563* patent.

Subsequent to this meeting, on October 10, 1986, Schuurman filed the Answer and Counterclaim in the Textron litigation, which alleged fraud and inequitable conduct based on the withholding of references from German, Dutch and Swedish prosecutions, as both a defense and a basis for affirmative belief. (DX 1152; Tr. 155-56, 1052). At trial, Schuurman testified that he believed at the time he filed this Answer and Counterclaim that he had satisfied his Rule 11 obligations. (Tr. 1053-54, 1063-64). As such, Schuurman must have known that his allegations of inequitable conduct had evidentiary support, or at the very least, were likely to have evidentiary support after further investigations and discovery. n8 Indeed, Schuurman testified that he based his allegations on the publicly available statement of prior art that had been filed in the *'563* patent reexamination proceedings, which indicated that [*54] certain references had been cited during foreign prosecutions. (Tr. 1062). Schuurman further testified that based on this document he believed that additional discoveryneeded to be conducted in that area and that is why he filed a discovery request for the counterpart foreign prosecution files. (Tr. 1063). Again, even if Schuurman did not actually relay to Caterpillar his belief that this was an area that was sufficiently merit worthy to include in a legal pleading and to warrant further investigation, this knowledge is attributable to Caterpillar. Therefore, Caterpillar had constructive knowledge that inequitable conduct was a merit worthy, non-frivolous issue, that at the least, merited further investigation and consideration.

1998 U.S. Dist. LEXIS 23068, *

n8 In pertinent part, Rule 11 provides:

> By presenting to the court . . . a pleading, written motion, or other paper, an attorney or unrepresented party is certifying that to the best of the person's knowledge, information, and belief, formed after an inquiry reasonable under the circumstances . . . the allegations and other factual contentions have evidentiary support, or if specifically so identified, are likely to have evidentiary support after a reasonable opportunity for further investigation and discovery . . .

*Fed. R. Civ. P. 11(b)(3).*

[*55]

Apart from Caterpillar's constructive knowledge of the inequitable conduct issue imputed from Schuurman to Caterpillar based upon the filing of the Answer and Counterclaim in the Textron litigation, the Court also finds that Caterpillar knew or should have known about the inequitable conduct issue through its own investigation of the '563 patent. If Schuurman was put on inquiry notice of inequitable conduct from the publicly available reexamination proceedings, such that he could allege inequitable conduct in a pleading, be interested in conducting further investigation on the subject, Caterpillar's team of experienced patent agents investigating the '563 patent should have also recognized the inequitable conduct issue. (Tr. 1064). In addition, Caterpillar's investigation of the '563 patent should also have pointed it to the Textron litigation. Caterpillar was well aware of the Textron litigation and its importance to the FMS industry. Moreover Caterpillar admitted that at some point it learned that an inequitable conduct defense had been raised in the Textron litigation. The Answer and Counterclaim were publicly available documents that Caterpillar could have obtained and [*56] indeed, should have obtained in its investigations of the patents. However, Caterpillar did not obtain the pleadings, and did not ask Molins or anyone else, including the FMS Information Group about them or about the defenses that were being pursued in the Textron litigation. (Tr. 919-921). Had Caterpillar obtained these documents or inquired about them as it should have, then Caterpillar would have realized that inequitable conduct was a non-frivolous issue that required additional investigation.

In addition to the knowledge Schuurman possessed that warranted his pleading inequitable conduct in the Textron litigation, Schuurman had additional knowledge of inequitable conduct during this time frame that is constructively attributable to Caterpillar. Although the contents have been shielded by Schuurman's assertion of attorney-client privilege, it is not disputed that a ten volume report dated December 1986 and sent to the FMS Information Group in January 1987, was generated by Schuurman and others at Arnold, White and Durkee. This report contained one volume which was entitled "Inequitable Conduct." (Tr. 1037). In order for this report to be dated December 1986, it was undoubtedly [*57] in the making prior to December 3, 1986. In order for Arnold, White & Durkee to produce an entire volume that concentrated on inequitable conduct, the firm must have had significant knowledge of inequitable conduct by Molins. Therefore, Arnold, White & Durkee's knowledge of inequitable conduct that was memorialized in this report is constructively attributable to Caterpillar.

3. Caterpillar's Post-License Knowledge

Subsequent to entering into a license with Molins, Caterpillar again received storm warnings of the inequitable conduct issue. Thompson had occasion to meet with Eifler and Schuurman at AIPLA meetings. Although these meetings were primarily social events, Mr. Thompson could not deny that the topic of inequitable conduct may have been discussed. (Tr. 193-94). Moreover, although Caterpillar had, at one time, denied ever having knowledge that summary judgment motions had been filed in the Textron litigation (D.I. 193 at 51), the testimony and evidence adduced at trial establishes that Caterpillar's Thompson did, in fact, know that summary judgment was filed. (Tr. 191, 197, DX 1392). Despite Caterpillar's knowledge that the motions were filed, Caterpillar never inquired [*58] into the details of the motions and never obtained copies of the briefs from the Court. (Tr. 198). As stated earlier, setting aside Caterpillar's constructive knowledge for the moment, Caterpillar should have known of the inequitable conduct issue from its own investigations of the reexamination proceedings, as well as from the Answer and Counterclaim filed in the Textron litigation. Even if Caterpillar initially believed that pleading inequitable conduct was "boilerplate" (Tr. 160), the fact that inequitable conduct continued to be raised by Mr. Eifler and Mr. Schuurman months later, should have alerted Caterpillar that inequitable conduct was a viable and important issue. Combining this knowledge with Caterpillar's constructive knowledge, the Court finds that Caterpillar should have inquired further into the summary judgment motions that were filed. Had Caterpillar done so, Caterpillar would have learned of the seriousness of the inequitable conduct issue and

undoubtedly would have learned about the Court's opinion on the summary judgment motions in August 1990, which held that Wagenseil was a material prior art reference, but that issues of fact regarding intent remained to be [*59] litigated.

While the Court realizes that some of the storm warnings Caterpillar received may have been subtle initially, the Court finds that taken in total, the foregoing events were sufficient to put a reasonable person on inquiry notice of Molins' alleged inequitable conduct. Accordingly, in answer to the question when did Caterpillar know enough to excite further inquiry, the Court finds that Caterpillar knew or should have known, either actually or constructively, that inequitable conduct was in issue prior to November 1990.

In addition, the Court further finds that, despite having inquiry notice prior to November 1990, Caterpillar failed to exercise reasonable diligence to investigate Molins' allegedly fraudulent activity. Despite the knowledge Caterpillar had or should have had about the inequitable conduct issue, Caterpillar neither followed up with Molins, nor with its own investigations. Indeed, Mr. Thompson testified that he believed his license with Caterpillar was a solution to their potential infringement problem and that, absent "smoking gun" information, he was not interested in, nor did he want his staff interested in, inequitable conduct issues or the Textron [*60] litigation. (Tr. 181). Mr. Muir corroborated Caterpillar's attitude toward additional information it may have received regarding the Textron litigation, when Mr. Muir testified that any information Caterpillar received, subsequent to entering its license with Molins, regarding the FMS Information Group, Mr. Schuurman and the Textron litigation, was filed in an inactive file at Caterpillar known as the conflicts file. (Tr. 940-941). Mr. Muir also acknowledged that people at Caterpillar, including, Mr. Booth and Mr. McFall, who had been involved in investigating the '563 patent before Caterpillar took its license with Molins, read a number of trade magazines containing information about the Textron litigation. But, as Mr. Thompson testified, absent information about actual fraud, his staff "would not have been so foolish" as to bring information regarding foreign patent references and inequitable conduct to his attention, because the staff knew that Mr. Thompson was trying to "shut down" the investigation of the patent. (Tr. 179-180).

As Mr. Thompson's testimony indicates, Caterpillar was waiting for the "smoking gun" or, in the language of the analogy courts have used for the [*61] statute of limitations, the lightening and the thunder. However, as the Court stated when it discussed the "knew or should have known standard," inquiry notice is triggered by a low level of awareness and not full knowledge of the

alleged wrongdoing. Because the Court finds that Caterpillar failed to exercise reasonable diligence, the Court rejects Caterpillar's contention that the statute of limitations should be tolled on the grounds of fraudulent concealment.

In sum, based upon the record in this case, the Court finds that Caterpillar was on inquiry notice of Molins' alleged inequitable conduct before November 1990 and that despite being on inquiry notice, Caterpillar failed to exercise reasonable diligence to investigate the alleged inequitable conduct. Because Caterpillar waited until November 1994 to file its suit, the Court concludes that Caterpillar's RICO claims are time-barred.

C. Whether Caterpillar's Common Law Claims Are Barred By The Statute Of Limitations

Caterpillar and Molins agree that the statute of limitations period for Caterpillar's common law fraud and deceit claims is three years, and that this statute began to run from the date Caterpillar knew or should [*62] have known of its alleged injury. However, Caterpillar contends that because unjust enrichment is an equitable claim, the statute of limitations should not apply. Molins has not pled the equitable defense of laches, but instead contends that the three year period limitations period for Caterpillar's fraud and deceit claim is equally applicable to Caterpillar's unjust enrichment claim.

[HN18] When the statute of limitations bars a legal remedy, it may also bar an equitable remedy in an analogous case or in reference to the same subject matter. *Artesian Water Co. v. Lynch, 283 A.2d 690, 692.* Generally, an analogous statute of limitations is given great weight in deciding whether a plaintiff's equitable claim is time-barred. See e.g. *Toner v. Allstate Insurance Co., 1994 U.S. Dist. LEXIS 20539, 1994 WL 828294, *3 (D. Del. 1994)* (holding that absent unusual or mitigating circumstances, statute of limitations period at law would apply to equitable claim); *Adams v. Jankouskas, 452 A.2d 148, 157 (Del. Supr. 1982).* In this case, Caterpillar's claim for unjust enrichment is predicated on the same facts as Caterpillar's fraud and deceit claims. [*63] Caterpillar seeks money damages, which is generally a claim at law. Therefore, the Court concludes that the three year statute of limitation period applicable to Caterpillar's analogous fraud claim also applies to Caterpillar's unjust enrichment claim.

As stated earlier, Caterpillar's Complaint in this action was filed on November 21, 1994. Accordingly, the critical date for the statute of limitations analysis for Caterpillar's common law claims is November 21, 1991. Because the Court has concluded in its analysis of the RICO claims that Caterpillar knew or should have known about Molins' alleged inequitable and fraudulent

1998 U.S. Dist. LEXIS 23068, *

conduct prior to November 1990, the Court likewise concludes that Caterpillar should have known about the injuries set forth in its fraud, deceit and unjust enrichment claims well before November 21, 1991.

To the extent that Caterpillar contends that the statute of limitations is tolled because of fraudulent concealment by Molins, the Court rejects Caterpillar's argument. [HN19] Tolling of the statute of limitations based on fraudulent concealment continues until the facts underlying plaintiff's cause of action are discovered or could have been discovered by the exercise [*64] of reasonable diligence.*Bradley v. Maryland Casualty Co., 563 F. Supp. 602, 606 (D. Del. 1983); Giordano v. Czerwinski, 59 Del. 226, 216 A.2d 874, 876 (Del. 1966).* Stated another way, tolling continues "until such time that a person or ordinary intelligence and prudence would have facts sufficient to put them on inquiry which, if pursued, would lead to the discovery of the injury." *In re ML-Lee Acquisition Fund II, 848 F. Supp. 527, 554 (D. Del. 1994).* As the Court has already concluded in the context of Caterpillar's RICO claims, Caterpillar was on inquiry notice and therefore should have known of Molins' alleged misconduct prior to November 1990. Therefore, Caterpillar could have discovered the facts underlying its claims had it exercised reasonable diligence. Accordingly, the Court concludes that the statute of limitations for Caterpillar's common law claims is not tolled and, like Caterpillar's RICO claims, Caterpillar's fraud, deceit and unjust enrichment claims are time-barred.

## CONCLUSION

For the reasons discussed, the Court concludes that Caterpillar's has not met its burden of establishing its RICO, fraud, deceit and [*65] unjust enrichment claims. In the alternative, the Court concludes that Caterpillar's RICO, fraud, deceit and unjust enrichment claims are barred by the statue of limitations.

A Final Judgment Order consistent with this Opinion has been entered.

## CERTIFICATE OF SERVICE

I, Glenn C. Mandalas, Esquire, hereby certify that on August 8, 2005, I caused to be electronically filed a true and correct copy of the foregoing document with the Clerk of the Court using CM/ECF, which will send notification that such filing is available for viewing and downloading to the following counsel of record:

> Richard D. Kirk, Esquire
> THE BAYARD FIRM
> 222 Delaware Avenue, Suite 900
> Wilmington, DE 19801

I further certify that on August 8, 2005, I caused a copy of the foregoing document to be served by hand delivery on the above-listed counsel of record and on the following in the manner indicated:

### BY FEDERAL EXPRESS

> Joseph Lucci, Esquire
> WOODCOCK WASHBURN, LLP
> One Liberty Place, 46th Floor
> Philadelphia, PA 19103

> YOUNG CONAWAY STARGATT & TAYLOR, LLP
>
> _____
> John W. Shaw  (No. 3362)
> Glenn C. Mandalas (No. 4432)
> The Brandywine Building
> 1000 West Street, 17th Floor
> Wilmington, Delaware  19801
> (302) 571-6600
> gmandalas@ycst.com
>
> *Attorneys for Plaintiff Enzon Pharmaceuticals, Inc.*