LEXSEE 2005 U.S. DIST. LEXIS 1158

**MEDTRONIC VASCULAR, INC. and MEDTRONIC USA, INC, Plaintiffs, v. ADVANCED CARDIOVASCULAR SYSTEMS, INC. and GUIDANT SALES CORP., Defendants.**

Civ. No. 98-80-SLR

UNITED STATES DISTRICT COURT FOR THE DISTRICT OF DELAWARE

*2005 U.S. Dist. LEXIS 1158*

**January 5, 2005, Decided**

**SUBSEQUENT HISTORY:** Summary judgment granted, in part, summary judgment denied, in part by *Medtronic Vascular, Inc. v. Advanced Cardiovascular Sys., 2005 U.S. Dist. LEXIS 1160 (D. Del., Jan. 5, 2005)*

**PRIOR HISTORY:** *Medtronic Vascular, Inc. v. Advanced Cardiovascular Sys., 2005 U.S. Dist. LEXIS 824 (D. Del., Jan. 5, 2005)*

**DISPOSITION:** Motions for partial summary judgment filed by Advanced Cardiovascular Systems, Inc., and by Guidant Sales Corp., granted.

**LexisNexis(R) Headnotes**

**COUNSEL:** [*1] Karen Jacobs Louden, Esquire, Philip Bangle, Esquire of Morris, Nichols, Arsht & Tunnell, Wilmington, Delaware. Counsel for Plaintiffs Medtronic Vascular, Inc. and Medtronic USA, Inc. Of Counsel: Raphael V. Lupo, Esquire, Donna M. Tanguay, Esquire, Mark G. Davis, Esquire, James G. Rizzo, Esquire of McDermott Will & Emery, Washington D.C.

Frederick L. Cottrell, III, Esquire, Anne Shea Gaza, Esquire, Richards Layton & Finger, Wilmington, Delaware. Counsel for Defendants Advanced Cardiovascular Systems, Inc. and Guidant Sales Corp. Of Counsel: J. Michael Jakes, Esquire, Gerald F. Ivey, Esquire, Michael A. Morin, Esquire of Finnegan, Henderson, Farabow Garrett & Dunner, Washington, D.C.

**JUDGES:** ROBINSON, Chief Judge.

**OPINIONBY:** Sue L. Robinson

**OPINION:**

**MEMORANDUM OPINION**

Dated: January 5, 2005
Wilmington, Delaware

**ROBINSON, Chief Judge**

**I. INTRODUCTION**

Medtronic AVE ("Medtronic") filed suit against Advanced Cardiovascular Systems, Inc. ("ACS") on February 18, 1998, n1 alleging patent infringement of the Boneau patents, breach of contract, trade secret misappropriation, unfair competition, restoration of property wrongfully acquired, conversion, declaratory relief, [*2] and equitable claims. (D.I. 1) Specifically, Medtronic alleges that ACS infringes the Boneau patents by manufacturing, using, selling, offering for sale, and importing its Multi-Link stents in the United States. (Id. at P 2) Medtronic also contends that ACS wrongfully acquired and is misusing its stent technology to develop and to patent balloon expandable stents. n2 In this regard, Medtronic seeks a declaratory judgment that its Micro Stent II and GFX Stent Delivery Systems do not infringe ACS's patents relating to balloon expandable stents.

- - - - - - - - - - - - - - - - - -

n1 On November 15, 2000, this case was stayed pending resolution of two different appeals to the Federal Circuit. The case was not reopened until March 20, 2003.

n2 AVE holds the Lau patents relating to balloon expandable stents. (Id. at P 3)

- - - - - - - - - - - - - - - - - -

On March 30, 1998, ACS answered the complaint denying Medtronic's allegations and asserting a variety of affirmative defenses including the "first-to-file" rule, noninfringement, estoppel, invalidity, statute of limitations, [*3] laches, and federal preemption. (D.I. 8) ACS

Case 1:04-cv-01285-GMS    Document 79-2    Filed 10/03/2005    Page 2 of 12

Page 2
2005 U.S. Dist. LEXIS 1158, *

amended its answer on June 15, 1998, to add an additional affirmative defense of inequitable conduct and to assert invalidity counterclaims as to the Boneau patents. (D.I. 24 at PP 5, 6, 113, 114)

Due to its similarity to other actions involving the Boneau patents, this case will be tried with Civil Action Nos. 98-80-SLR and 98-478-SLR. The patents in suit are the Boneau Patents, *United States Patent Nos. 5,292,331* ("the '331 patent"), *5,674,278* ("the '278 patent"), *5,879,382* ("the '382 patent"), *6,344,053* ("the '053 patent") and the Lau Patents, *United States Patent Nos. 5,514,154* ("the '154 patent"), *5,603,721* ("the '721 patent"), *5,735,893* ("the '893 patent"), *6,056,776* ("the '776 patent"), *6,066,167* ("the '167 patent"), *6,066,168* ("the '168 patent"), and *6,432,133* ("the '133 patent").

The court has jurisdiction over these matters pursuant to *28 U.S.C. §§ 1331, 1338(a)* and *2201(a)*. Pending before the court is ACS's and Guidant's motions for summary judgment that Medtronic's state law claims are barred under Delaware law and that Mr. Boneau is not a joint inventor of the Lau patents. (D.I. 404, 406) For the reasons [*4] stated, these motions are granted.

## II. BACKGROUND

### A. Assignment of Boneau's Rights

In 1988 Michael Boneau conceived of the idea that gave rise to the Boneau patents. (D.I. 431, Ex. 2 at 133) Initially Boneau and his partner, Dr. Stertzer, and Dr. Stertzer's lab technician, Mr. Hidalgo, formed Accuterix. (D.I. 471 at 8) Boneau assigned the rights to the application that would later become the *'331 patent*, to Accuterix. Id. The three men would then form Endovascular Support Systems, Inc. ("ESS") to further develop the Boneau technology, and Boneau's rights were subsequently assigned to ESS. Id. In 1992, ESS sold the rights to the Boneau technology to Proprietary Extrusion Technologies ("PET"), which was a subsidiary of AVE. Id. In 1996, Dr. Stertzer, at the time a shareholder, became a director of AVE. (D.I. 471 at 15) Eventually AVE would become Medtronic, the plaintiff in this case. (D.I. 17)

### B. Boneau's Contact with ACS

In 1989, he approached ACS because he was looking for a partner to help develop his technology. (D.I. 407 at 4; 471 at 4) Before meeting, the parties executed nondisclosure agreements regarding an "Endo-vascular Support Device/System [*5] (stent)." (D.I. 431 at Ex. 5; D.I. 475 at Ex. 2) Beginning in May 1989, Mr. Boneau met with high ranking ACS executives to discuss the "Boneau stent concepts." Later that year, Mr. Boneau gave ACS a copy of the drafted patent application that gave rise to the *'331 patent*, before he actually filed the application with the United States Patent and Trademark Office. (D.I. 407 at 4; D.I. 475 at Ex. 4; D.I. 469 at 3, 4) At these meetings Mr. Boneau explained the structure and functional capabilities of his stents. (D.I. 469 at 4)

By July of 1989, ACS had begun research on developing its own stent technology. (D.I. 475, Ex. 5 at 1-2) The initial concept, titled "'Hoops and Stocking' Stent," consisted of "a series of thin, stiff circular rings, placed longitudinally along the length of the stent . . . held together by a porous, stocking-like mesh material." (Id. at 2) A year later, ACS engineers authored a feasibility report on eleven stent technologies, including the Boneau stent. (D.I. 475 at Ex. 7) ACS intended the report to "lead into selection of a first generation ACS stent that offers value and may be introduced for clinical studies in a relatively short period of time." Id. [*6] After considering the eleven stents, the engineers recommended that ACS pursue its own designs, the "Zigzag ring" and "Sigwart_flex" stents, as opposed to any of the others considered. (Id. at 3)

Sometime in 1990, Dr. Lau, an ACS engineer, met with Mr. Boneau and Dr. Stertzer to evaluate the Boneau stent technology. *(D.I. 475 Ex. 6 at 471)* At these meetings Dr. Lau inquired into the prototypes, material composition, dimensions and operation (i.e., expansion) of the Boneau stents. (D.I. 475, Ex. 6 at 461-62) Eventually ACS informed Mr. Boneau that it was not interested in pursuing his stent design, citing concerns that the peaks of the stent, and the pits forming in the material, would promote blood clotting. (D.I. 431, Ex. 7 at 408)

Around March 5, 1990, Dr. Lau, on behalf of ACS, began exploring a stent made up of multiple sinusoidally patterned rings that were connected together at various points. (D.I. 475, Ex. 6 at ACS 125915) The design resembles the Multi-Link design.

### C. Disclosure of ACS's Multi-Link Stent

In 1992, ACS filed a European Patent Application ("Lau European Application"). (D.I. 431 at Ex. 27) This application was published worldwide in [*7] 1993. Id. According to Medtronic, there was technical trade secret information in this patent application n3 that was obtained by ACS during its meetings with Mr. Boneau. (D.I. 488, Ex. 42 at 3, 9). n4

---

n3 Medtronic indicated that the application contained information regarding the stent's design, expansion, and use of a plurality of rings on a single balloon. (D.I. 488, Ex. 42 at 3-4)

n4 A copy of the application was in Medtronic's files at the time of discovery for this case. (D.I. 431 at Ex. 27)

Case 1:04-cv-01285-GMS   Document 79-2   Filed 10/03/2005   Page 3 of 12

Page 3
2005 U.S. Dist. LEXIS 1158, *

At a 1993 American Heart Association ("AHA") Scientific Sessions meeting, ACS's Multi-Link stent was presented, as it appeared in a 1993 issue of Circulation, AHA's official journal. (D.I. 431, Ex. 8 at ACS00696894) It is possible that Bradley Jendersee, Medtronic's Director and CEO, was at this AHA meeting. Mr. Jendersee attended several AHA meetings, but could not specifically recall whether or not he attended the 1993 meeting. n5 (D.I. 431, Ex. 12 at 138-44)

> n5 On another Scientific Sessions registration sheet, however, he indicated he had attended it. (D.I. 431, Ex. 12 at 138-44)

[*8]

Also in 1993, the ACS Multi-Link stent was the subject of a chapter in the Textbook of Interventional Cardiology (Eric J. Topol, M.D. ed., 1993) and three professional journal articles. n6 (D.I. 431 at Ex. 22)

> n6 Sigwart U., Haber R., Kowalchuk G., Simonton C., Butler N., Virmani R., The New ACS Metallic Stent: Experimental and Clinical Experience, 88 Circulation 1 (1993). (D.I. 431 at Ex. 11) Sigwart U., Haber R., Virmani R., Buller N., Haber R., Simonton C., Kowalchuk G., Bronco: Balloon Expandable Coronary Stent, 14 Eur. Heart J. 39 (1993). (Id. at Ex. 25) Sigwart U., Khosravi F., Virmani R., Buller N., Haber R., Simonton C., Kowalchuk G., Bronco: Ein neuer, Balloon-expandierbarer, flexibler stent, 82 Z. Kardiol 71 (1993). (Id. at Ex. 26)

ACS displayed its Multi-Link stent at the 1994 Scientific Sessions meeting and made a presentation regarding its comparison with "slotted tube" designs. Mr. Jendersee was present at the meeting, but it is unknown whether an ACS representative [*9] attended this specific presentation. (D.I. 431, Ex. 12 at 139) Generally, Medtronic employees would review abstracts that were presented at professional meetings and would have been particularly interested in information regarding its competitors, including ACS. (D.I. 431, Ex. 13 at 118-19; Ex. 14 at 170-72)

Also in 1994, ACS presented the Multi-Link stent (including displaying prototypes) and distributed literature about the technology at a international stent conference in the Netherlands. (D.I. 431, Ex. 16 at PP 4-7) Medtronic's predecessor, AVE, was also in attendance. (Id. at P 8) At a session titled, "Why I Like My Stent," Medtronic and ACS gave successive five-minute presentations on their respective technologies. (Id., Ex. 17 at 3) This presentation included a "personal but factual opinion of the stent" and information about design, characteristics, delivery systems, size and "expected technical improvements." (D.I. 431, Ex. 17) Later that same year, ACS also presented the Multi-Link at a conference, in Milan, which representatives of AVE attended. (D.I. 431, Ex. 21 at 567)

## III. STANDARD OF REVIEW

A court shall grant summary judgment only if [*10] "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Fed. R. Civ. P. 56(c)*. The moving party bears the burden of proving that no genuine issue of material fact exists. See *Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 n.10, 89 L. Ed. 2d 538, 106 S. Ct. 1348 (1986)*. "Facts that could alter the outcome are 'material,' and disputes are 'genuine' if evidence exists from which a rational person could conclude that the position of the person with the burden of proof on the disputed issue is correct." *Horowitz v. Fed. Kemper Life Assurance Co., 57 F.3d 300, 302 n. 1 (3d Cir. 1995)* (internal citations omitted). If the moving party has demonstrated an absence of material fact, the nonmoving party then "must come forward with 'specific facts showing that there is a genuine issue for trial.'" *Matsushita, 475 U.S. at 587* (quoting *Fed. R. Civ. P. 56(e)*). The court will "view the underlying facts and all reasonable inferences therefrom in the light most favorable [*11] to the party opposing the motion." *Pa. Coal Ass'n v. Babbitt, 63 F.3d 231, 236 (3d Cir. 1995)*. The mere existence of some evidence in support of the nonmoving party, however, will not be sufficient for denial of a motion for summary judgment; there must be enough evidence to enable a jury reasonably to find for the nonmoving party on that issue. See *Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249, 91 L. Ed. 2d 202, 106 S. Ct. 2505 (1986)*. If the nonmoving party fails to make a sufficient showing on an essential element of its case with respect to which it has the burden of proof, the moving party is entitled to judgment as a matter of law. See *Celotex Corp. v. Catrett, 477 U.S. 317, 322, 91 L. Ed. 2d 265, 106 S. Ct. 2548 (1986)*.

## IV. ACS'S AND GUIDANT'S MOTION FOR SUMMARY JUDGMENT THAT MEDTRONIC'S STATE LAW CLAIMS ARE BARRED

### A. Trade Secrets

ACS and Guidant argue that Medtronic should be estopped from bringing state law trade secret claims because the three year statute of limitations has expired. (D.I. 407) ACS and Guidant ask the court to find that

Case 1:04-cv-01285-GMS    Document 79-2    Filed 10/03/2005    Page 4 of 12

Page 4
2005 U.S. Dist. LEXIS 1158, *

Medtronic had at least constructive notice of the alleged theft of trade secrets in 1993 or 1994. (Id.)

Medtronic claims that [*12] it did not become aware of ACS's alleged use of the Boneau technology until 1996 n7 when it was preparing to release its Boneau stent in the United States market. (D.I. 471 at 9) At that time, Medtronic became aware of Boneau's meetings with ACS in 1989, and the subsequent exchange of information between Boneau and ACS. Id. Therefore, Medtronic asserts, it was not aware that ACS had access to its trade secrets until two years before it filed this action. Id.

n7 Medtronic cites two different years with respect to this argument. First, it claims it found out in 1997, then it cites 1996, when Dr. Stertzer became a director of AVE. (D.I. 471 at 15) For the purposes of this memorandum opinion, the court uses the earlier of these two dates.

Under Delaware law, the statute of limitations for a theft of trade secrets claim is three years from the date the misappropriation was discovered or, by the exercise of reasonable diligence, should have been discovered. See 6 Del. Code Ann. tit. 6, § 2006 (2004). [*13]

In this case, Medtronic has admitted that many of the trade secrets that were allegedly stolen were included in the Lau European application. AVE should have known or could have discovered the unauthorized use of its trade secrets in 1993. Thus, 1996 was the last year that Medtronic could have filed its trade secret claims.

**B. Other State Law Claims**

ACS and Guidant argue that Medtronic's breach of contract, actual fraud, unjust enrichment and unfair competition claims are also barred by the statute of limitations. (D.I. 407) Medtronic argues that the limitations period was tolled until AVE found out, or should have known, about ACS's alleged wrongful acts because it had no way of knowing ACS had access to its trade secrets and had actively misled Mr. Boneau and Dr. Stertzer about its intent to pursue stent technologies.

Under Delaware law, Medtronic's claims are subject to a three year limitations period. See 10 Del. C. § 8106. Ordinarily this period begins to "run at the time of the alleged wrongful act 'even if the plaintiff is ignorant of the cause of action,'" but there are two relevant exceptions. Merck & Co., Inc. v. SmithKline Beecham Pharms. Co., 1999 Del. Ch. LEXIS 242, No. C.A. 15443-NC, 1999 WL 669354, [*14] at *42 (Del. Ch. Aug. 5, 1999) (quoting In re Dean Witter Partnership Litig., C.A. No. 14816, 1998 Del. Ch. LEXIS 133, at *15 (Del. Ch. July 17, 1998)). First, the limitations period can be tolled until an injury manifests itself if the circumstances or facts surrounding the cause of the injury are "inherently unknowable." See Studiengesellschaft Kohle v. Hercules, Inc., 748 F. Supp. 247, 252 (D. Del. 1990). Second, the limitations period can be tolled if the circumstances or facts that would have put a plaintiff on notice with respect to the harm are fraudulently concealed by a defendant. Id. at 252.

To show that the "inherently unknowable" exception applies, a plaintiff must prove that it was "blamelessly ignorant of the act or omission or injury." Id. (citing Wilson v. Simon, 1990 Del. Super. LEXIS 170, 1990 WL 63922 (Del. Super. Ct. March 22, 1990). Knowledge imputable to a corporation, such as AVE, comes from its agents. In other words, the knowledge of a corporate agent is directly attributable to the corporation. See, e.g., E.I. du Pont de Nemours & Co. v. Admiral Ins. Co., 1996 Del. Super. LEXIS 48, C.A. No. 89C-AU-99, 1996 WL 111133, at *2-3 (Del [*15] Super. Ct. Feb. 22, 1996), Cedar Lane Farms, Inc. v. Taylor, 1992 Del. Ch. LEXIS 102, Civ. A. No. 993-K, 1992 WL 111210, at *3 (Del. Ch. May 18, 1992); see also Fletcher Cyclopedia of the Law of Private Corporations § 789 (2002). This is true regardless of when the agent obtained the information as long as the information has "some significance which the [agent] could be reasonably expected to perceive." E.I. du Pont de Nemours & Co., 1996 Del. Super. LEXIS 48, 1996 WL 111133, at *3; Fletcher Cyclopedia of the Law of Private Corporations § 799.

Even assuming that Medtronic or AVE did not know about the agreements and meetings between Mr. Boneau and ACS prior to 1993, the knowledge of Dr. Stertzer with respect to these meetings is attributable to AVE in 1993. Dr. Stertzer's knowledge of these meetings would have been directly relevant to his position as CEO of AVE, especially in as competitive a market as stent design. Therefore, if the "inherently unknowable" exception ever applied, it stopped tolling the limitations period in 1993 when Dr. Stertzer became the CEO of AVE.

The fraudulently concealed exception requires that a plaintiff show that a defendant actively concealed information with the [*16] intent to "prevent inquiry or knowledge of the injury." Id. (citing Bradley v. Maryland Cas. Co., 563 F. Supp 602, 606 (D. Del. 1983). In this case, there is no evidence of record that ACS actively concealed any of its activities. It presented its Multi-Link stent at professional conferences and meetings. It offered prototypes and literature regarding the stent to anyone in attendance at most of these meetings. It filed a patent application that, according to Medtronic, contained AVE and Medtronic trade secrets. Therefore, the court declines to find that ACS fraudulently concealed its activities.

Because neither exception would toll Medtronic's state law claims past 1993, Delaware law required that Medtronic file its state law claims by 1996.

## V. ACS'S AND GUIDANT'S MOTION FOR SUMMARY JUDGMENT THAT MR. BONEAU IS NOT A JOINT INVENTOR OF THE LAU PATENTS

### A. Joint Invention of the Lau Patents

Joint invention occurs when more than one individual significantly contributes to the conception of a solution to a problem and it is this solution that becomes the subject matter of a patent. See *35 U.S.C. § 116 (2004)*; *Fina Oil and Chem. Co. v. Ewen, 123 F.3d 1466, 1474 (Fed. Cir. 1997)*; [*17] Chisum on Patents § 2.02[2]. Conception occurs with "the 'formation in the mind of the inventor, of a definite and permanent idea of the complete and operative invention' [so that] 'only ordinary skill would be necessary to reduce the invention to practice.'" *Ethicon, Inc. v. United States Surgical Corp., 135 F.3d 1456, 1460 (Fed. Cir. 1998)* (quoting *Borroughs Wellcome Co. v. Barr Lab, Inc., 40 F.3d 1223, 1227-28 (Fed. Cir. 1994)*; *Hybritech, Inc. v. Monoclonal Antibodies, Inc., 802 F.2d 1367, 1376 (Fed. Cir. 1986)*). Thus, joint inventorship requires that a co-inventor do more than simply explain "concepts that are well known and the current state of the art." *Fina Oil, 123 F.3d at 1476*.

Upon the issuance of a patent, it is presumed that there are no inventors other than those listed on the patent. *Bd. of Educ. v. American Bioscience, Inc., 333 F.3d 1330, 1337 (Fed. Cir. 2003)*. A party challenging this presumption must prove, by clear and convincing evidence, that they significantly contributed to the conception of the invention. Id. An inventor's testimony stating that he contributed to the [*18] conception at issue is not, by itself, enough to support a finding of inventorship. Such testimony must be corroborated by either contemporaneous documents, testimony of someone else or circumstantial evidence. *Ethicon, 135 F.3d at 1461*.

There is no evidence, other than Mr. Boneau's statements, that the information Dr. Lau received at those meetings substantially contributed to his conception of the Lau stent technology. The mere fact that Mr. Boneau met with ACS is not enough to overcome the presumption that the inventors listed on the Lau patents are the true and correct inventors.

Medtronic argues that the Multi-Link stent is merely a series of Boneau stents linked together, and that this is evidence that Mr. Boneau contributed to its conception. Based on the court's claim construction of the Boneau and Lau patents, however, Medtronic's assertion is incorrect. The Lau patents claim a stent consisting of a series of connected circular elements that have a circumferential pattern of U-shaped, W-shaped or Y-shaped members. The Boneau patents claim stents that can be used in multiples, which are made up of substantially straight segments that extend the length of [*19] the stent. In light of these constructions, the court declines to infer joint inventorship from the functional similarities between the Boneau and Lau stents.

### B. Invalidity of Lau Patents Under § 102(f)

In order to prove the Lau patents are invalid under § 102(f), Medtronic must prove, by clear and convincing evidence, that Mr. Boneau both conceived of Dr. Lau's invention and communicated this conception to Dr. Lau. See *Gambro Lundia AB v. Baxter Healthcare Corp., 110 F.3d 1573, 1576 (Fed. Cir. 1997)*. To show communication, Medtronic must show that Mr. Boneau "'enabled an ordinary [artisan], without the exercise of any ingenuity and special skill on his part, to construct and put the improvement in successful operation.'" Id. (quoting *Agawam Woolen v. Jordan, 74 U.S. (7 Wall.) 583, 19 L. Ed. 177 (1868)*). As with joint inventorship, an inventor's testimony regarding his conception must be corroborated. See id.

As stated above, there is not enough evidence to support a finding that Mr. Boneau conceived of the Lau stent technology. Thus, the Lau patents are not invalid under § 102(f).

## VI. CONCLUSION

For the reasons state, ACS's and Guidant's [*20] motion for summary judgment that Medtronic's state law claims are barred under Delaware law is granted. ACS's and Guidant's motion for summary judgment that Mr. Boneau is not a joint inventor of the Lau stent technologies and that the Lau patents are not invalid under § 102(f) is also granted. An order consistent with this memorandum opinion shall issue.

### ORDER

At Wilmington this 5th day of January, 2005, consistent with the memorandum opinion issued this same day;

IT IS ORDERED that:

1. ACS's and Guidant's motion for summary judgment that Medtronic's state law claims are time barred (D.I. 406) is granted.

2. ACS's and Guidant's motion for summary judgment that Mr. Boneau is not a joint inventor of the Lau patents and the Lau patents are not invalid under § 102(f) (D.I. 404) is granted.

Sue L. Robinson
United States District Judge

Case 1:04-cv-01285-GMS   Document 79-2   Filed 10/03/2005   Page 6 of 12

LEXSEE 2001 U.S. DIST. LEXIS 17656

**SUNTEX INDUSTRIAL CORP., LTD. and RNB GARMENTS PHILIPPINES, INC., Plaintiffs, v. THE CIT GROUP/BBC, INC. n/k/a/ THE CIT GROUP COMMERCIAL SERVICES, INC., Defendant.**

Civil Action No. 99-81-RRM

UNITED STATES DISTRICT COURT FOR THE DISTRICT OF DELAWARE

*2001 U.S. Dist. LEXIS 17656*

**September 28, 2001, Decided**

**DISPOSITION:** [*1] Defendant's supplemental motion for summary judgment was granted.

**LexisNexis(R) Headnotes**

**COUNSEL:** For SUNTEX INDUSTRIAL CORP., LTD, RNB GARMENTS PHILIPPINES, INC., plaintiffs: Robert A. Penza, Gordon, Fournaris & Mammarella, Wilmington, DE.

For CIT GROUP/BBC INC., defendant: Steven L. Caponi, Blank, Rome, Comisky & McCauley, Wilmington, DE.

**JUDGES:** Roderick R. McKelvie, UNITED STATE DISTRICT JUDGE.

**OPINIONBY:** Roderick R. McKelvie

**OPINION:**

### ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

This is a commercial dispute. Plaintiff Suntex Industrial Corp., Ltd. is a corporation organized under the laws of the Kingdom of Thailand, with its principal office in Bangkok. Plaintiff RNB Garments Philippines, Inc. is a corporation organized under the laws of the Republic of the Philippines, with its principal offices in Manila. Defendant, CIT Group/BBC Inc., n/k/a The CIT Group Commercial Services, Inc. ("CIT"), is a financial services company organized under the laws of the state of North Carolina. CIT has offices in North Carolina and New York.

Plaintiffs commenced this action on July 21, 1998, by filing their verified complaint in the United States District Court for the Southern District of New York [*2] against Chase Manhattan Bank and CIT. The claims against Chase and CIT sought to recover payments that allegedly were due under letters of credit established by Ruff Hewn, Inc., a corporation with its offices in North Carolina, that were issued to secure payment of goods supplied to Ruff Hewn by Suntex and RNB. On February 9, 1999, the District Court in New York dismissed the action against Chase, and transferred the action against CIT to the District of Delaware, because Ruff Hewn's Chapter 11 petition under the U.S. Bankruptcy Code was pending in this district.

In their complaint, Suntex and RNB seek to hold CIT liable for the outstanding amount payable to the plaintiffs under the letters of credit and assert the following specific claims against CIT: (i) tortious interference with supply contracts between the plaintiffs and Ruff Hewn; (ii) breach of the Letter of Credit Agreement that existed between CIT and Ruff Hewn (as alleged third party beneficiaries) (iii) negligent and intentional interference with prospective economic advantage; and (iv) unjust enrichment.

On April 27, 1999, after the action was transferred, CIT answered the plaintiffs' complaint, raised certain affirmative [*3] defenses, and moved to dismiss the complaint pursuant to *Rule 12(b)(6) of the Federal Rules of Civil Procedure* asserting that the complaint failed to state a claim upon which relief could be granted. On June 10, 1999, pursuant to a June 8, 1999 stipulation between the parties relating to the filing of CIT's amended answer, CIT withdrew its motion to dismiss. On June 14, 1999, CIT amended its answer to the complaint. The parties then proceeded to take discovery. On March 31, 2000, CIT moved for summary judgment. The court granted the plaintiffs' request to conduct additional discovery and denied the defendant's summary judgment motion without prejudice, noting that it would allow CIT to re-file its motion after the close of the extended discovery period. On December 15, 2000, upon the conclu-

Case 1:04-cv-01285-GMS    Document 79-2    Filed 10/03/2005    Page 8 of 12

Page 2
2001 U.S. Dist. LEXIS 17656, *

sion of the extended discovery period, CIT filed a Supplemental Motion for Summary Judgment. The motion was briefed and argued before the court in a teleconference on February 5, 2001.

On February 6, 2001, the court informed the parties' counsel that the court would grant the defendant's motion for summary judgment. The following memorandum of law will describe the reasoning behind the court's decision [*4] to grant summary judgment in favor of CIT.

I. FACTUAL BACKGROUND

The court draws the following facts from the plaintiffs' complaint and from documents and declarations attached in the appendices to the parties' briefing.

On December 29, 1994, CIT entered into a Factoring Agreement with Ruff Hewn in connection with Ruff Hewn's accounts receivables. Under that agreement CIT purchased certain of Ruff Hewn's accounts receivable and agreed to advance funds to Ruff Hewn upon submission of qualified accounts less a specified reserve amount. CIT retained the right to revise the reserve amount from time to time if, in its judgment, such revisions were necessary to protect CIT with regard to any indebtedness owed by Ruff Hewn. On the same date, CIT entered into a Letter of Credit Agreement with Ruff Hewn whereby CIT promised to guarantee payment or performance of letters of credit in conjunction with the purchase of foreign goods and inventories. CIT retained the right to reject any discrepant presentation under a letter of credit issued with CIT's assistance. Pursuant to the Letter of Credit Agreement, CIT arranged for the issuance of letters of credit by Chase to cover transactions [*5] entered into by Ruff Hewn.

Between April and October 1997, Suntex entered into several contracts with Ruff Hewn under which Suntex sold ladies' garments to Ruff Hewn. As a precondition to the sales contracts, Ruff Hewn procured and delivered to Suntex five letters of credit issued by Chase in amounts varying from $ 217,777.48 to $ 405,523,20, each payable against delivery of documents. Each letter of credit identified specific goods to be shipped, specified the date by which the goods must be shipped, listed specific documents that must be presented with the letter of credit for the letter of credit to be honored, and specified an expiration date. Each letter of credit was guaranteed by CIT.

During the months of August, September, and October of 1997, RNB entered into several contracts with Ruff Hewn under which RNB sold, and Ruff Hewn purchased, articles of clothing. On July 1, 1997, as required by the sales contract, Ruff Hewn procured and delivered to RNB a letter of credit issued by Chase in the amount of $ 187,914.96 payable against delivery of the documents. This letter of credit also identified specific goods to be shipped, specified the date by which the goods must be shipped, [*6] listed specific documents that must be presented with the letter of credit for the letter of credit to be honored, and specified an expiration date. The RNB letter of credit was also guaranteed by CIT.

After securing their respective letters of credit, both Suntex and RNB manufactured and shipped garments to Ruff Hewn by air and sea freight and informed Ruff Hewn of the name of the shippers. When the freight carriers arrived, Ruff Hewn unloaded the garments and accepted the garments as conforming goods. Both Suntex and RNB presented to Chase the letters of credit and supporting documents, demanding that Chase pay the full amount due from Ruff Hewn. For each of the shipments at issue in this case, however, Chase determined that the presentations contained discrepancies that did not conform to the terms of the letters of credit. After reviewing each discrepant presentation, Chase prepared a list of the discrepancies, which it forwarded to CIT for review. It was Chase's business practice not to satisfy a discrepant presentation or pay the beneficiary unless CIT notified Chase that the discrepancies were waived.

On October 24, 1997, Ruff Hewn notified Chase and CIT that it agreed to [*7] waive any discrepancies in the shipments. However, in light of its determination that Ruff Hewn did not have the money to reimburse CIT for the payments, CIT exercised its contractual right not to waive the discrepancies in this case. While Chase has paid portions of the Suntex and RNB letters of credit, plaintiffs allege that they are still owed the respective sums of $ 748,287.09 and $ 106,927.31, plus interest.

Under the terms of the letters of credit, if the goods are shipped by sea, the freight forwarder's cargo receipt must indicate that the goods are consigned to Ruff Hewn. If the goods are shipped by air, then the original bill of lading for the shipment of the goods must be delivered to Ruff Hewn. As a consequence, Ruff Hewn could and did take complete possession of the goods at customs and subsequently dispose of the goods even if the letters of credit were dishonored. Neither Chase nor CIT had control or possession of the goods in question.

There is no evidence on the record as to what happened to the goods at issue in this case after Ruff Hewn took possession of them. They are no longer in Ruff Hewn's possession. On January 21, 1998, Ruff Hewn filed a petition for bankruptcy [*8] in the United States Bankruptcy Court for the District of Delaware. As the District Count in New York has granted summary judgment in favor of Chase, CIT is the only remaining defendant in the case.

II. DISCUSSION

### A. Choice of Law

Plaintiffs' contend that New York law should apply to each of their claims. Defendant, however, believes that North Carolina law should govern each of the asserted claims. The court reviews the choice of law rules applicable to each of the claims separately.

In determining what law governs tort claims, Delaware courts use the "most significant contacts" test, as set forth in the *Restatement (Second) of Conflicts § 145*. See *Travelers Indemnity Co. v. Lake, 594 A.2d 38 (Del. 1990)*. Under this test, courts review four types of contacts in evaluating which forum has the most significant relationship to the conduct and the parties. These contacts are: place of the injury, place of the conduct causing the injury, domicile and place of business of the parties, and place where the relationship, if any, between the parties is centered. *Restatement (Second) of Conflicts § 145(2)*.

The relevant contacts with North Carolina are: (i) [*9] Ruff Hewn's principal place of business was located in North Carolina; (ii) CIT's agreements and relationships with Ruff Hewn, including the Factoring Agreement and Letter of Credit Agreement, originated out of and were managed by CIT executive and management personnel located in Charlotte, North Carolina; (iii) all funds received by CIT in connection with the Ruff Hewn relationship were received in Charlotte, North Carolina. The relevant contacts with New York are: (i) the physical location of CIT's letter of credit department is located in New York; (ii) New York is Chase's and CIT's domicile and is the site of those companies' principal offices.

As both plaintiffs are foreign corporations and the place of the alleged injuries to Suntex and RNB are located in Thailand and the Philippines respectively, that factor does not impact the choice between New York and North Carolina law. Rather, the relevant factors in this context are the domiciles of the parties, the place of the conduct causing the injury and the place where the relationship between the parties is centered. The domiciles of the parties are Thailand, the Phillippines, and North Carolina. CIT's actions and decisions that [*10] allegedly give rise to liability were controlled and performed by CIT management and account executives in North Carolina. Thus, North Carolina is both the place of the conduct causing the injury and the place where the relationship between the parties is centered. Accordingly, the court finds that these factors favor choosing to apply North Carolina law to plaintiffs' tort claims. The same reasoning compels the court to apply North Carolina law to plaintiffs' unjust enrichment claim.

With respect to the breach of contract claim, plaintiffs' claims arise out of a Letter of Credit Agreement that was executed in North Carolina. According to its terms, that agreement is considered part of the Ruff Hewn-CIT Factoring Agreement. The Factoring Agreement contains an explicit choice of law provision in paragraph 21, which provides that "this agreement and all transactions hereunder shall be governed as to validity, enforcement, interpretation, and construction and in all other respects by the laws of the State of North Carolina. . . ." Delaware courts will enforce a choice of law provision as long as the jurisdiction selected, in this case North Carolina, bears some material relationship [*11] to the transaction. *Annan v. Wilmington Trust Co., 559 A.2d 1289, 1293 (Del. 1989)*. Because CIT's conduct under the terms of the contract is to be governed by North Carolina law, the court will apply North Carolina law to plaintiffs' breach of contract claim as well.

### B. Summary Judgment Standard

A court may grant a motion for summary judgment if the record shows "that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Fed. R. Civ. P. 56(c)*. In deciding a summary judgment motion, the court must view the evidence in the light most favorable to the non-moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587, 89 L. Ed. 2d 538, 106 S. Ct. 1348 (1986)*. The moving party bears the burden of establishing the absence of any genuine issue of material fact. *Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 323, 91 L. Ed. 2d 265, 106 S. Ct. 2548 (1986)*. Once this burden is met, the non-moving party must demonstrate specific facts that indicate a genuine material issue for trial. *Fed. R. Civ. P. 56(e); Celotex Corp., 477 U.S. at 324*. [*12] Summary judgment should only be granted if the court finds, in consideration of all of the evidence, that no reasonable trier of fact could find for the non-moving party. *Matsushita Elec. Indus. Co., 475 U.S. at 587*.

### C. Are There Genuine Issues of Material Fact Regarding Plaintiffs' Claim That Defendant Tortiously Interfered With Plaintiffs' Supply Contracts With Ruff Hewn?

To succeed on a claim for tortious interference with contract, the plaintiffs must prove five elements: (1) the existence of a valid contract between the plaintiff and a third party, conferring upon the plaintiff some contractual right against the third party; (2) the defendant had knowledge of the plaintiff's contract with the third party; (3) the defendant intentionally induced the third party not to perform his contract with the plaintiff; (4) that in so doing, the defendant acted without justification; (5) the defendant's act caused the plaintiff actual damages. See *Peoples Sec. Life Ins. Co. v. Hooks, 322 N.C. 216, 367 S.E.2d 647, 649-50 (N.C. 1988)*.

Case 1:04-cv-01285-GMS    Document 79-2    Filed 10/03/2005    Page 10 of 12

Page 4
2001 U.S. Dist. LEXIS 17656, *

The plaintiffs allege that CIT tortiously interfered with their supply agreements by refusing to waive the discrepant [*13] provisions and by failing to advise Chase to pay the letters of credit. CIT contends that the plaintiffs' claim is deficient with respect to three of the five elements of the claim. First, CIT claims that the plaintiffs cannot as a matter of law establish intentional inducement. Second, CIT claims that the plaintiffs have no evidence that CIT acted without justification when it refused to waive the discrepancies. Last, CIT argues that there is no evidence that CIT's actions proximately caused the plaintiffs' damages.

The court's analysis will focus on the lack of justification element because that element is most central to the parties' dispute and because the parties' arguments regarding the other disputed elements, inducement and causation, directly relate to whether CIT was justified in refusing to authorize payment by Chase. CIT contends that its action does not amount to a tort because it was justified by a legitimate business interest and because CIT expressly reserved the independent right to approve or disapprove all waivers. Plaintiffs argue in opposition that CIT's refusal to waive discrepancies was without justification because it violated CIT's implied obligation to deal [*14] in good faith with the plaintiffs. See U.C.C. § 5-109 cmt. 1. They submit that the issue of whether CIT acted without justification is a genuine material fact that should be determined by a jury.

North Carolina authority is clear that complaints alleging tortious interference with contract should be dismissed as a matter of law when the alleged interference is justified or privileged. See, e.g., *Peoples Sec. Life Ins.*, 367 S.E.2d at 650; *Smith v. Ford Motor Co.*, 289 N.C. 71, 221 S.E.2d 282 (1976). Naturally, if the a defendant's sole motive is a malicious wish to injure the plaintiff, his actions are not justified. If, however, the defendant is acting for a legitimate business purpose, his actions are privileged. Actions taken in the natural course of doing business inevitably interfere in the business relations of others. That interference, however, is legally justifiable and non-actionable so long as it is carried on in furtherance of one's own interests and by means that are lawful. *Childress v. Abeles*, 240 N.C. 667, 84 S.E.2d 176 (N.C. 1954).

The duties and liabilities of an issuer of a letter of credit, or a guarantor of [*15] that issuer, are governed exclusively by the terms of the letter of credit. *Courtaulds North America, Inc. v. North Carolina Nat'l Bank*, 528 F.2d 802 (4th Cir. 1975) (applying North Carolina law). There is no dispute between the parties that the express terms of the Letter of Credit Agreement give CIT the right to waive or to reject discrepant provisions and that the presentations made to Chase by the plaintiffs were indeed discrepant. Applicable commercial law requires strict compliance with those terms. Any discrepancy, however seemingly minor, permits dishonor of a letter of credit. *Id.* at 805-06.

Plaintiffs seek to establish lack of justification by alleging that CIT breached the implied contractual duties of good faith and fair dealing. "Good faith" means honesty in fact in the conduct or transaction concerned. U.C.C. § 1-201(19). Plaintiffs have not set forth any evidence that shows that CIT was dishonest in any transaction in this action. The dishonor of a demand for payment when that demand does not comply with the terms of the Letter of Credit cannot constitute bad faith.

Moreover, plaintiffs set forth no facts to support their contention [*16] that CIT's actions were unjustified. Rather, the factual record demonstrates that CIT's actions were reasonably related to their legitimate business interest. CIT, as Ruff Hewn's lender, had a direct interest in the subject matter of Ruff Hewn's supply contracts with the plaintiffs and by refusing to waive the discrepancies, was acting out of a concern that Ruff Hewn would be unable to pay CIT. Accordingly, the plaintiffs cannot demonstrate, as a matter of law, that CIT tortiously interfered with their supply contracts.

D. Are There Genuine Issues of Material Fact Regarding Plaintiffs' Claim, as Third Party Beneficiary, That CIT Breached the Letter of Credit Agreements Between Itself and Ruff Hewn?

Although plaintiffs' have no contractual relationship with CIT, the plaintiffs next allege that CIT breached the Letter of Credit Agreement between CIT and Ruff Hewn. Plaintiffs argue that CIT violated the covenant of good faith and fair dealing that was due to them when it refused to waive discrepancies under the Agreement. As a prerequisite to asserting this claim, plaintiffs must demonstrate that they have standing as third party beneficiaries of that agreement.

To establish their [*17] standing to assert this claim under North Carolina law, plaintiffs must prove that they were intended third party beneficiaries of the Letter of Credit Agreement. *Chemical Realty Corp. v. Home Fed. Sav. & Loan Ass'n of Hollywood*, 84 N.C. App. 27, 351 S.E.2d 786, 790 (N.C. App. 1987) (citations omitted). The test to be applied is whether the parties to the contract, CIT and Ruff Hewn, intended to confer a benefit directly upon the third party or whether the benefit to the third party was merely incidental. *Vogel v. Supply Co.*, 277 N.C. 119, 177 S.E.2d 273 (N.C. 1970). In making this determination, North Carolina courts consider the circumstances surrounding the transaction and the terms of the contract as a whole on a case by case basis. *Raritan River Steel Co. v. Cherry Bekaert & Holland*, 329 N.C. 646, 407 S.E.2d 178, 182 (N.C. 1991). Moreover, it must be "clearly apparent" that the contract was intended

Case 1:04-cv-01285-GMS    Document 79-2    Filed 10/03/2005    Page 11 of 12

Page 5
2001 U.S. Dist. LEXIS 17656, *

to benefit the third party and any doubt should be resolved against such intent. *Chemical Realty Corp., 351 S.E.2d at 791.*

The court cannot glean any evidence from the record that the parties to the Letter of Credit [*18] Agreement intended for the plaintiffs, as third parties, to be able to enforce the terms of that Agreement. Moreover, general principles of the commercial law concerning letters of credit stress that "the letter of credit is essentially a contract between the issuer and the beneficiary and is recognized by this Article as independent of the underlying contract between the customer and the beneficiary." *U.C.C. § 5-114* cmt. 1; see also *Alaska Textile Co. v. Chase Manhattan Bank, 982 F.2d 813, 815-16 (2d Cir. 1992)* (noting that "this independence principle infuses the credit transaction with the simplicity and certainty that are its hallmarks").

Transactions that utilize letters of credit necessarily involve two independent contracts: the underlying purchase and sale agreement between buyer and seller and the letter of credit between the issuer and the buyer, which is the bank's promise to pay the seller when the proper documentation is submitted. The seller has no contractual rights against the bank that issues the letter of credit. In this case, there is a third independent contract: CIT's Letter of Credit Agreement with the buyer Ruff Hewn, under which CIT promised [*19] to guarantee the bank's payment of the letters of credit, subject to certain terms. Like the bank's letter of credit agreements, CIT's agreement to act as guarantor of those letters of credit is presumptively independent from the underlying purchase and sale agreements between the Ruff Hewn and the plaintiffs. Because plaintiffs have failed to point out any reason to depart from the well accepted independence principle in this case, the plaintiffs have no contractual right to proceed against CIT.

Accordingly, the court finds that the plaintiffs cannot, as a matter of law, establish that they were intended third party beneficiaries of CIT's financing agreements with Ruff Hewn. While a contracting party or an intended beneficiary to a contract can raise claims for breach of contract founded in the common law and statutory duties of good faith and fair dealing, the plaintiffs, as unintended third party beneficiaries do not have the standing to assert such claims.

E. Are There Genuine Issues of Material Fact Regarding Plaintiffs' Claim That CIT Negligently and Intentionally Interfered With Plaintiffs' Prospective Economic Advantage?

Because the court can find no North Carolina case [*20] recognizing a claim for negligent interference with prospective economic advantage, it will only address the plaintiffs' claim for intentional interference with economic advantage. In order to successfully assert a claim for intentional interference with prospective economic advantage, under North Carolina law, the plaintiff must prove that (1) the defendant induced a third party to refrain from entering a contract; (2) the contract would have ensued but for the interference; (3) the defendant lacked justification and acted with "malicious design to injure the [plaintiff] or gain some advantage at his expense;" and (4) the plaintiff was damaged as a result of the defendant's actions. *Spartan Equip. Co. v. Air Placement Equip. Co., 263 N.C. 549, 140 S.E.2d 3, 11 (N.C. 1965); Cameron v. New Hanover Mem'l Hosp., Inc., 58 N.C. App. 414, 293 S.E.2d 901, 916-17 (N.C. App. 1982).*

Because this claim is analogous to a claim for tortious interference with contract, the court's reasoning regarding the plaintiffs' inability to satisfy the lack of justification element in plaintiffs' tortious interference claim, found in Section II.C. of this order, applies [*21] with equal force to this claim. Plaintiffs have not produced any evidence that shows that CIT acted for the purpose of maliciously injuring the plaintiffs and not for a justifiable reason related to its legitimate business interest. Therefore, they cannot make out their intentional interference with prospective advantage claim as a matter of law.

F. Are There Genuine Issues of Material Fact Regarding Plaintiffs' Claim That Defendant Was Unjustly Enriched?

Plaintiffs assert that CIT was unjustly enriched by refusing to waive the discrepant presentations. To maintain a cause of action for unjust enrichment, the plaintiffs must prove: (1) a benefit was conferred on the defendant by the plaintiffs; (2) the acceptance of that benefit by the defendant; and (3) circumstances that make it inequitable for the defendant to retain the benefit. *FDIC v. British-American, Corp., 755 F. Supp. 1314, 1324 (E.D.N.C. 1991).*

Courts have consistently dismissed similar unjust enrichment claims brought by beneficiaries of letters of credit agreements against financial institutions when the beneficiary could have avoided the loss by submitting documents that conformed to the terms of the [*22] letter of credit. See, e.g., *Alpargatas v. Century Bus. Credit Corp., 183 A.D.2d 491, 583 N.Y.S.2d 441, 442 (App. Div. 1992).* The parties agree that the presentations at issue were discrepant under the terms of the letters of credit. Moreover, it is undisputed that CIT expressly retained the right to decide whether to waive discrepancies in the shipments. Under the terms of their agreement, even the slightest discrepancy justified CIT's refusal to authorize payment. Simply put, CIT cannot be said to have been

unjustly enriched at plaintiffs' expense for justifiably acting within the terms of its agreement.

### III. CONCLUSION

The court finds that defendants have met their burden in establishing that there is no genuine material issue for trial with respect to each of the plaintiffs' claims. Accordingly, summary judgment in CIT's favor is proper with respect to all claims.

It is therefore,

**ORDERED** that Defendant's Supplemental Motion for Summary Judgment (Docket Item 94) is hereby granted.

Roderick R. McKelvie

UNITED STATE DISTRICT JUDGE

Dated: September 28, 2001